Daniel ANDERSON, Jr., et al.,
Plaintiffs–Appellants,

v.

DOUGLAS & LOMASON CO.,
INC., et al., Defendants,

Douglas & Lomason Co., Inc.,
Defendant–Appellee.

No. 92–7554.

United States Court of Appeals,
Fifth Circuit.

June 23, 1994.

As Corrected July 28, 1994.

As Amended on Denial of Rehearing
and Suggestion for Rehearing En Banc
Sept. 9, 1994.

Richard T. Seymour, Sharon Vinick, Lawyers' Committee for Civil Rights, Washington, DC, for appellants.

Samuel A. Marcosson, E.E.O.C. Office of General Counsel, Washington, DC, for amicus E.E.O.C.

Robert Godfrey, George K. McPherson, Jr., Smith, Currie & Hancock, Atlanta, GA, for appellees.

Before JOHNSON, SMITH, and EMILIO M. GARZA, Circuit Judges.

EMILIO M. GARZA, Circuit Judge:

The plaintiffs brought a class action lawsuit against the Douglas & Lomason Co. ("D & L" or "the Company") on July 5, 1985, alleging that D & L intentionally discriminated against blacks in its hiring, promotion, and termination practices. The district court, after a lengthy bench trial, entered judgment against the plaintiffs on their Title VII, 42 U.S.C. § 2000e *et seq.*, and 42 U.S.C. § 1981 claims. We affirm the district court's decision.[1]

I

D & L operates a plant in Cleveland, Bolivar County, Mississippi, that manufactures automobile parts. The plant employs approximately 657 people, 70% of whom are black. Applicants seeking entry-level positions with D & L need only meet certain minimal requirements, such as being at least eighteen years of age, physically able to perform the work, and able to read and write. The plaintiffs challenge certain hiring, promotion, and termination practices followed by D & L at the Cleveland plant after James

---

1. The plaintiffs in this case earlier appealed the decision of the district court denying their application for preliminary injunctive relief that would have regulated the hiring practices of D & L. We affirmed the district court's decision to deny a preliminary injunction in *Anderson v. Douglas & Lomason Co.,* 835 F.2d 128 (5th Cir. 1988).

Grizzard became plant manager in October 1982. The period between October 1982 and April 1986, when Grizzard ceased being manager at the Cleveland plant, was referred to at trial as "the Grizzard years."

### A

The plaintiffs first challenge the hiring practices adopted by Patty Haynes when she became personnel manager at the Cleveland plant in September 1981. Haynes's hiring practices, which D & L followed throughout the Grizzard years, substantially differed from those of her predecessor, Harold Keeton. Keeton allowed employees to take applications for other persons, allowed people to submit applications twenty-four hours a day, took applications whether or not D & L was hiring, and kept all applications in his "active" file for one year. He generally interviewed two to three applicants for every available position. In making hiring decisions, Keeton looked at the applicant's experience and attempted to hire those applicants with the most relevant work experience. Haynes, on the other hand, would not let employees take applications home, required all people who wanted to apply for employment to come to D & L's plant, accepted applications only when D & L was hiring, and kept applications for six months. She also accepted only one or two applications for every available position. Haynes testified that in making hiring decisions, she looked at the applicant's relevant work experience and would hire "the best person for the job."

During periods when D & L was hiring, Haynes permitted individuals who called the Company seeking information about possible employment to make appointments at which they could fill out an application. Haynes also accepted applications from individuals who came to the plant without appoint-

ments.[2] If a person called or came to the plant while D & L was hiring but after the applicant pool reached what Haynes considered to be the optimal size, plant guards told the individual either that D & L was not hiring or was not taking applications.[3] During periods that D & L was not hiring, Haynes or the guards informed individuals inquiring about employment either that the Company was not taking applications or was not hiring. Thus, it was possible for individuals to be told that D & L was not taking applications both when the Company was and was not hiring.

D & L also hired employees in what can best be called "spurts." Grizzard, after meeting with his department heads and supervisors, would determine whether D & L needed to hire additional workers. If D & L did need additional workers, Grizzard would so inform Haynes, who would begin taking applications. Haynes then would hire the number of employees sought by Grizzard. D & L rarely hired employees on a one-at-a-time or continuous basis and sometimes went months without hiring anyone.

D & L modified its application and hiring procedures in May 1985 by using the Mississippi State Employment Service ("MSES") to provide a pool of applicants from which it could hire. When D & L needed to hire employees, it would notify the MSES. The MSES then would refer both regular and on-the-job-training ("OJT") applicants to D & L.[4] Haynes would interview the referred applicants and select new employees using separate job orders for the regular and OJT applicants hired. All hiring from the MSES referrals occurred on three separate spurts from May to September 1985. D & L has not hired any production workers since that time.

Haynes instructed the guards to allow people to enter the plant to fill out applications only when D & L was hiring and also gave the guards the names of those individuals with appointments to fill out applications.

**2.** Because of the large number of employees involved in deciding when D & L needed to hire employees, news that D & L was hiring quickly spread throughout the Company's general work force. For example, on one occasion individuals came to the plant to fill out applications even before Grizzard told Haynes that D & L would be hiring additional employees.

**3.** A security fence, gate, and guardhouse prevented unauthorized persons from entering the plant.

**4.** D & L received financial benefits from the state's on-the-job training program for every OJT applicant hired.

## B

The plaintiffs next contend that D & L engaged in a pattern or practice of discrimination by refusing to promote blacks to leader and foreman positions.[5] D & L had no written criteria or guidelines for promotions, and Grizzard did not post notices concerning available promotion opportunities. Instead, department supervisors selected leaders and foremen for their departments with little or no input from Grizzard. Although D & L did not have written criteria for promotions, the supervisors consistently applied the following subjective criteria when selecting leaders and foreman: attitude, work record, relevant work experience, leadership abilities, willingness to help other employees, commitment to D & L, and seniority. Thus, D & L's promotion criteria are predominately of a subjective nature.

## C

The plaintiffs also allege that D & L engaged in discriminatory practices by failing to provide blacks with temporary upgrades and permanent promotions to maintenance department positions. D & L employed a job-bidding process, as required by its collective bargaining agreement with the union representing D & L's employees, whereby employees had to submit bids for available "craft" positions. D & L, however, sometimes gave production employees temporary upgrades to craft jobs on a short-term basis.[6] D & L did not allow employees to bid on temporary upgrade positions, and the supervisors of the departments into which an employee would be temporarily upgraded determined whom to upgrade. The chosen employee's supervisor, however, could block the upgrade if the employee was needed for production work.

D & L considered employees in the general maintenance and rack maintenance departments to hold craft positions. As such, D & L required employees seeking those jobs to participate in the bidding process and maintenance department supervisors selected production employees for temporary upgrades to maintenance positions. The primary duties of general maintenance employees included pipe welding and repairing broken machinery. Welding, however, was the primary function of rack maintenance employees. Consequently, D & L considered welding experience to be more important than seniority for the purposes of temporary upgrades and permanent promotions to maintenance department jobs.

## D

The plaintiffs finally contend that D & L discharged employees, using the Company's garnishment policy as a pretext, in retaliation for the employees filing charges with the Equal Employment Opportunity Commission ("EEOC"). D & L's shop rules provided that the Company would discharge any employee who received four or more garnishments from different creditors within a two-year period. Under this rule, only those garnishments not satisfied, withdrawn, or stayed within thirty days after D & L informed the employee of their existence counted against the four-garnishment limit. The two-year period began to run on the date D & L discussed the first garnishment with the employee and expired on the date that the thirty-day grace period for the fourth garnishment expired. Haynes, who was responsible for administering the garnishment policy, forgave all garnishments that D & L received before she became personnel manager.

## II

## A

The plaintiffs contend that the district court erred by analyzing the hiring and

---

**5.** D & L promotes production employees to leaders so that it can evaluate their performance and potential to become foremen. D & L either selects foremen from among the leaders or hires them from outside the company. Both leaders and foremen are paid hourly. D & L also employs salaried supervisors, whom it selects from among the foremen or hires from outside the company. The plaintiffs do not contend that D & L discriminated in promoting blacks to the salaried supervisor positions.

**6.** D & L would give an employee a *temporary* upgrade to a craft position when a regular craft employee was ill or on vacation, or simply when D & L needed an additional craft employee because of an increased work load.

promotion class claims under the disparate treatment model instead of under the disparate impact model.[7] We examine discrimination claims using the disparate impact model when employment practices are "facially neutral in their treatment of different groups but ... in fact fall more harshly on one group than another and cannot be justified by business necessity." *International Bhd. of Teamsters v. United States*, 431 U.S. 324, 335 n. 15, 97 S.Ct. 1843, 1854 n. 15, 52 L.Ed.2d 396 (1977). Although class action plaintiffs may challenge subjective or discretionary employment practices under the disparate impact model, *Watson v. Fort Worth Bank & Trust*, 487 U.S. 977, 990, 108 S.Ct. 2777, 2786–87, 101 L.Ed.2d 827 (1988), the use of subjective or discretionary decision-making does not itself create an inference of discriminatory conduct. *Id.* at 999, 108 S.Ct. at 2791 (plurality opinion). Instead,

> "the plaintiff's burden in establishing a prima facie case [of discrimination] goes beyond the need to show that there are statistical disparities in the employer's work force. The plaintiff must begin by identifying the specific employment practice that is challenged.... Especially in cases where an employer combines subjective criteria with the use of more rigid standardized rules or tests, the plaintiff is in our view responsible for isolating and identifying the specific employment practices that are allegedly responsible for any observed statistical disparities."

*Wards Cove Packaging Co. v. Atonio*, 490 U.S. 642, 656, 109 S.Ct. 2115, 2124, 104 L.Ed.2d 733 (1989) (quoting *Watson*, 487 U.S. at 994, 108 S.Ct. at 2788–89). Thus, "[t]he disparate impact model applies only when an employer has instituted a specific procedure, usually a selection criterion for employment, that can be shown to have a causal connection to a class based imbalance in the work force." *Pouncy v. Prudential Ins. Co.*, 668 F.2d 795, 800 (5th Cir.1982); *see also Wards Cove*, 490 U.S. at 657–58, 109 S.Ct. at 2125 (noting that a plaintiff alleging a discriminatory impact claim must "specifically show[ ] that each challenged practice has a significantly disparate impact on employment opportunities for whites and non-whites").[8]

The district court refused to analyze the plaintiffs' hiring and promotion claims using the disparate impact model because they did not identify a specific aspect of subjective decision-making by D & L that was shown to have any causal connection to the alleged class-based imbalance in D & L's general or supervisory work force. The plaintiffs pointed only to D & L's policy requiring individuals to fill out applications at the plant as a specific employment practice causing a class-based imbalance in the work force. This, however, does not justify analyzing the case under the disparate impact model because the plaintiffs did not demonstrate that the disparity they complain of was the result of the challenged policy. *See Wards Cove*, 490 U.S. at 657–58, 109 S.Ct. at 2125. Moreover, the plaintiffs identified no specific policy that allegedly caused a race-based imbalance in the number of persons who received promotions. Instead, the plaintiffs merely launched a wide-ranging attack on the cumulative effects of D & L's employment practices. The disparate impact model is not the appropriate vehicle from which to launch such an attack. *Pouncy*, 668 F.2d at 800. Consequently, the district court did not err in refusing to analyze the plaintiffs' claims using the disparate impact model.[9]

---

7. Even though plaintiffs alleged violations of both § 1981 and Title VII, the elements of both claims are identical. *Flanagan v. Aaron E. Henry Community Health Servs. Ctr.*, 876 F.2d 1231, 1233 (5th Cir.1989); *Payne v. Travenol Lab., Inc.*, 673 F.2d 798, 818 (5th Cir.), *cert. denied*, 459 U.S. 1038, 103 S.Ct. 451, 74 L.Ed.2d 605 (1982). Therefore, we employ only one analysis in evaluating the plaintiffs' Title VII and § 1981 claims.

8. After the plaintiff has established a prima facie case of discrimination, "the employer carries the burden of producing evidence of a business justi-

fication for his employment practice." *Wards Cove*, 490 U.S. at 659, 109 S.Ct. at 2126. However, "the ultimate burden of proving that discrimination against a protected group has been caused by a specific employment practice remains with the plaintiff *at all times*." *Watson*, 487 U.S. at 987, 108 S.Ct. at 2790, *quoted in Wards Cove*, 490 U.S. at 549, 109 S.Ct. at 2126.

9. The district court also held that even if the plaintiffs did present a prima facie case under the disparate impact theory, they would not be able to satisfy their burden of persuasion because

We thus review the plaintiffs' claims under the disparate treatment model.

## B

■ In a disparate treatment class action, the plaintiffs "must prove discriminatory intent and demonstrate more than 'the mere occurrence of isolated or accidental or sporadic discriminatory acts.'" *Carroll v. Sears, Roebuck & Co.*, 708 F.2d 183, 190 (5th Cir.1983) (quoting *Teamsters*, 431 U.S. at 336, 97 S.Ct. at 1855). The plaintiffs must establish "by a preponderance of the evidence that racial discrimination was the [employer's] standard operating procedure—the regular rather than the unusual practice." *Id.*

■ The plaintiffs may establish a prima facie case of disparate treatment "by the use of statistics if a 'gross' disparity in the treatment of workers based on race is shown." *Id.* However, "statistics are not irrefutable; they come in infinite variety and, like any other kind of evidence, they may be rebutted. In short, their usefulness depends on all of the surrounding facts and circumstances." *Teamsters*, 431 U.S. at 340, 97 S.Ct. at 1856–57. If statistical evidence is insufficient to establish discriminatory intent, the plaintiffs may bolster their case by introducing historical, individual, or circumstantial evidence. *Bernard v. Gulf Oil Corp.*, 841 F.2d 547, 568 (5th Cir.1988). The employer then may rebut the plaintiffs' prima facie case "by introducing proof that plaintiffs' statistics are 'inaccurate or insignificant' or by providing a 'non-discriminatory explanation for the apparently discriminatory result.'" *Id.* (citations omitted).

■ "[T]he ultimate determination of the existence of intentional discrimination is a question of fact, reviewed on appeal under the clearly erroneous standard." *Id.* In determining whether a finding is clearly erroneous, we must give "due regard to the trial court to judge the credibility of the witnesses." *Anderson v. Bessemer City*, 470 U.S. 564, 573, 105 S.Ct. 1504, 1511, 84 L.Ed.2d 518 (1985). "A finding is 'clearly erroneous' when although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been made." *United States v. United States Gypsum Co.*, 333 U.S. 364, 395, 68 S.Ct. 525, 542, 92 L.Ed. 746 (1948).

## III

The plaintiffs argue that the district court erred in finding that D & L did not discriminate against blacks by restricting access to application forms. They argue that D & L unlawfully restricted access when Haynes refused to give employment applications to a number of blacks while D & L was seeking to hire new employees.

■ In attempting to prove a prima facie case, the plaintiffs primarily relied on anecdotal evidence provided by class members. A number of individuals testified that they were unable to obtain applications from D & L. The district court found this anecdotal evidence unpersuasive because it was consistent with D & L's general application policies. This finding is not clearly erroneous. *See* part VIII.A *infra*. Additionally, the black individuals turned away at the gate by D & L guards never saw D & L give any applications to whites seeking employment, and no D & L employee ever directed derogatory or racially-oriented epitaphs at them.[10] Moreover, around the same time that D & L did not give these black individuals applica-

---

D & L "adequately justified the method and manner by which it conducted its hiring and put forth legitimate reasons totally unrelated to race for making the various changes in its practice. As such, ... plaintiffs have failed to show that the proffered hiring practices and changes therein did not serve the legitimate ends of the employer." *Id.* Because we hold that the plaintiffs did not present a prima facie case, we do not review whether they demonstrated by a preponderance of the evidence that they were discriminated against as a result of a specific employment practice.

10. One individual, Poitier Anderson, alleged that a guard told him that the Company was not giving applications to blacks. The district court did not find Anderson's testimony credible because Anderson filed two EEOC claims and filled out an EEOC questionnaire after the alleged statement was made without ever mentioning it. This finding is not clearly erroneous.

tions, D & L provided applications to many other blacks. Finally, the record contains no evidence indicating that D & L's application procedures affected potential black applicants any differently than potential white applicants.[11] Thus, the district court's finding that D & L did not discriminate against blacks who were seeking applications is not clearly erroneous. *See Falcon v. General Tel. Co.,* 815 F.2d 317, 322 (5th Cir.1987) (finding that an employer's application procedures were not discriminatory where no evidence was introduced to prove that the procedures affected non-whites any differently than whites).

## IV

The plaintiffs contend that statistical and anecdotal evidence established that D & L discriminated against blacks when hiring production workers during the Grizzard years. In comparing the number of blacks hired to the number of blacks who applied for production jobs, however, the district court found no evidence of discriminatory intent.

The job of production worker—an unskilled, entry-level position—required only that applicants be at least 18 years old, be able to read and write, and be able to bend, lift, and stoop. During the Grizzard years, D & L hired 482 production workers—46.5% of those hired were black. Black employees constituted more than 70% of D & L's general work force, and more than 80% of the production work force, during the Grizzard years. In Bolivar County, where D & L's plant is located, 1980 census data indicates that the overall labor force was 51.8% black,

with blacks constituting 70.1% of all operators, laborers, and fabricators.

### A

### 1

The plaintiffs first argue that the district court erred in crediting D & L's statistical analysis of its hiring practices during the Grizzard years. The plaintiffs contend that because D & L's statistical analysis was fatally flawed, the district court should have relied on seven sets of statistical data presented by their expert.[12] D & L, not surprisingly, finds fault with each of plaintiffs' seven standards and contends that the district court correctly relied upon the standard proposed by D & L's expert.

 Where plaintiffs use statistical evidence to challenge an employer's hiring practices, that evidence, to be probative of discriminatory intent, must compare the relevant portion of the employer's work force with the qualified population in the relevant labor market. *EEOC v. Olson's Dairy Queens, Inc.,* 989 F.2d 165, 168 (5th Cir. 1993). The dispute between the plaintiffs and D & L revolves around how to properly define the "relevant labor market." D & L contends that the labor market should be defined using an "applicant flow" analysis— i.e., arguing that D & L's available labor force is best determined by examining the applications of those persons who actually sought employment with the Company. The plaintiffs, on the other hand, contend that an

---

11. The plaintiffs also argue that D & L discriminated against blacks by relying on word-of-mouth to inform interested persons of job openings and that this practice resulted in blacks having less access than whites to hiring information. D & L officials, however, testified that it was common knowledge among all employees, including those in non-managerial positions, that the Company was going to be hiring. In fact, non-employees on occasion knew D & L was about to hire before Grizzard informed Haynes. For example, plaintiff Chris Harris, along with two other blacks, heard from a black, non-supervisory employee that D & L was hiring. However, when Harris, who was waiting at the plant

when Haynes arrived for work one morning, asked Haynes for an application, Haynes told her that D & L was not hiring. Later that morning, however, Grizzard informed Haynes that D & L would be hiring new employees, and Harris then obtained an application.

12. The EEOC filed an amicus curiae brief agreeing with the plaintiffs' contention that the district court erred in its statistical analysis of the evidence. We note, however, that the EEOC office in Mississippi rejected as meritless the discrimination charges filed by the plaintiffs.

applicant flow analysis should not be used here because some of the applications submitted during the Grizzard years were not available for examination.[13] Thus, the plaintiffs argue that any one of their seven different methods of measuring the relevant labor market was superior to D & L's applicant flow analysis.[14]

■ Actual applicant flow figures are the preferred method by which to measure an employer's hiring practices and performance. *Olson's Dairy Queens,* 989 F.2d at 168; *Phillips v. Joint Legislative Comm.,* 637 F.2d 1014, 1025 (5th Cir.1981), *cert. denied,* 456 U.S. 960, 102 S.Ct. 2035, 72 L.Ed.2d 483 (1982); *Hester v. Southern Ry. Co.,* 497 F.2d 1374, 1379 (5th Cir.1974); *see also Mister v. Illinois Cent. Gulf R.R. Co.,* 832 F.2d 1427, 1435 (7th Cir.1987) ("Statistical analysis of the actual applicants has the advantage of self-selection: the study examines how the employer actually treated people who wanted the job. Applicant studies are preferable as a rule because Title VII governs the treatment of applicants."). "Other statistical measures are necessarily imperfect in differing ways and varying degrees. The best the court can do is to accept what figures are available; allow for imperfections, skewing factors, and margins of error; and then take the figures for what they are worth. Sometimes this is much, sometimes little." *Phillips,* 637 F.2d at 1025. Thus, when applicant flow figures are flawed or otherwise unavailable, we have allowed plaintiffs to use other statistical measures to establish a prima facie case of discrimination. *See, e.g., id.* (noting that actual applicant flow figures were unavailable because the employer did not identify applicants by race); *Robinson v. Union Carbide Corp.,* 538 F.2d 652, 657–58 (5th Cir.1976) (upholding the district court's refusal to employ an applicant flow analysis), *modified in part on other grounds,* 544 F.2d 1258 (5th Cir.1977).

■ D & L's statistical expert, Dr. Joan Haworth, testified that, according to an applicant flow analysis, D & L did not discriminate in hiring black applicants. Haworth found that from April 1984 to January 1985, blacks constituted 46.7% of all applicants. She then compared this figure to the percentage of applicants hired by D & L during the Grizzard years who were black—45.5%—and determined that the difference was not statistically significant.[15] Thus, Dr. Haworth

13. The plaintiffs also seem to suggest that we should draw adverse inferences against D & L because of the Company's failure to preserve employment applications for a one year period, pursuant to the Uniform Guidelines on Employee Selection Procedures, 29 C.F.R. § 1607.4(A)–(B) (1978). However, the "Uniform Guidelines are not legally binding. They have not been promulgated as regulations and do not have the force of law." *Clady v. County of Los Angeles,* 770 F.2d 1421 (9th Cir.1985) (citing *General Elec. Co. v. Gilbert,* 429 U.S. 125, 141–42, 97 S.Ct. 401, 410–11, 50 L.Ed.2d 343 (1976)), *cert. denied,* 475 U.S. 1109, 106 S.Ct. 1516, 89 L.Ed.2d 915 (1986). Moreover, the applications kept by D & L roughly correspond to the six month period preceding the plaintiffs' filing of their EEOC charges. Although D & L normally would have discarded the April applications after six months, Haynes testified that she kept all applications after being notified of the EEOC charges. Consequently, the number of applications available for analysis was consistent with D & L's policy of keeping applications for only six months. We therefore decline to follow the plaintiffs' suggestion.

14. Because we agree with the district court that actual applicant flow was the best measure of D & L's performance, we need not address whether the district court erred in failing to follow the seven standards offered by the plaintiffs to define the labor pool available to D & L. The district court rejected each standard as being flawed.

15. Dr. Haworth divided the applications into six "pools," which reflected each hiring event, and compared the percentage of blacks and whites hired from the applicants in each pool. Only one hiring pool—pool 5, which covered the one-month period of October 1984—reflected a statistically significant standard deviation. Haworth also analyzed the pools on an aggregate basis, comparing the percentage of blacks hired who applied from April 1984 through mid-January 1985. She found what the parties agree to be a statistically significant standard deviation. Haworth testified, however, that pool 5 largely accounted for the deviation. When she excluded pool 5 from the analysis, she found the standard of deviation to be statistically insignificant. The district court credited Haworth's testimony that the aberrational result found in pool 5 was due to the fact that the percentage of white applicants with relevant employment experience was higher in pool 5 than in other pools. As a result, the district court found that pool 5 should be

concluded, D & L did not engage in discriminatory hiring practices.

■ The plaintiffs challenge Dr. Haworth's analysis on several grounds. They first assert that D & L did not keep all applications from the April to October 16 period, thus skewing the analysis so that the number of black applicants from that period was understated. As evidence of D & L's selective retention of applications, the plaintiffs point to the large difference between the number of applications submitted by blacks during the April to October period and the October 17 to January period.[16] The district court found, however, that one explanation for the large increase in applications submitted by blacks during the latter period was that Oliver Robinson, a black D & L employee, had begun a campaign to encourage blacks in Bolivar County to apply for employment at D & L and file discrimination charges against D & L with the EEOC.[17] This finding is not clearly erroneous.

■ As additional evidence that D & L failed to retain applications, the plaintiffs contend that the number of applications retained by D & L indicates that Haynes accepted approximately eight and one-half applications for every seven positions filled during the pre-suit period, but accepted about ten applications for every seven positions filled during the post-suit period. The plaintiffs contend that the difference demonstrates that D & L did not retain all applications from the April to October period. Haynes, however, testified that she believed she kept all the applications from the April to October period, although she ultimately was unsure whether she had discarded some applications. Moreover, Haworth testified that while she believed she had all the relevant

applications, she nevertheless had a "reasonably large amount" of the applications for the purposes of her analysis. The district court resolved this dispute by finding that D & L did retain all applications pertaining to the relevant period, and we cannot say that this resolution was clear error. *See Trevino v. Holly Sugar Corp.*, 811 F.2d 896, 901 (5th Cir.1987) (finding that the district court did not err in accepting an employer's statistical analysis because, while it was flawed, the plaintiffs' analysis suffered from more serious deficiencies); *Nash v. City of Houston Civic Ctr.*, 800 F.2d 491, 497 (5th Cir.1986) (noting that where there are competing yet permissible views of the evidence, we must affirm the district court's finding).

■ The plaintiffs next argue that even if the applicant flow analysis was the best standard by which to measure the labor pool available to D & L, the district court erred in accepting Dr. Haworth's analysis because it was based on samples too small to allow for a meaningful statistical analysis. When statistics are based on small sample sizes, the plaintiffs contend, the presence or absence of statistical significance is not a reliable indicator of discrimination. Whether or not a sample is too small to yield statistically meaningful results, however, must be determined on a case-by-case basis. *Watson*, 487 U.S. at 995 n. 3, 108 S.Ct. at 2789 n. 3; *Rendon v. AT & T Technologies*, 883 F.2d 388, 397 (5th Cir.1989). The district court found Dr. Haworth's analysis to be more credible and more persuasive than the seven analyses offered by the plaintiffs' expert. We find that the district court did not err in crediting D & L's statistical analysis, which demonstrated that D & L did not engage in discriminatory hiring practices, over the analyses offered by the plaintiffs.[18]

excluded from the analysis as an anomaly. This finding is not clearly erroneous. *See Lewis v. NLRB*, 750 F.2d 1266, 1276 n. 17 (5th Cir.1985) (noting that one significant standard deviation did not establish disparate treatment).

**16.** Applications submitted by blacks constituted 37.6% of the April to October applications and 60.4% of the October to January applications.

**17.** In reviewing the record, we note that many of the witnesses had little or no familiarity with the

charges that they signed and filed with the EEOC. Indeed, one person—Richard Grant— stated that he did not read the charge but merely signed it when it was presented to him. *See* note 46 *infra*.

**18.** Assuming *arguendo* that the pools were too small to permit meaningful statistical analysis, Dr. Haworth also analyzed the pools on an aggregate basis and found no statistically signifi-

## 2

The plaintiffs further argue that the district court erred in accepting Haworth's analysis of D & L's hiring practices during the period in which the Company exclusively relied upon MSES to provide acceptable applicants. In relying on Dr. Haworth's analysis, the district court found that her job-order-by-job-order analysis was more persuasive because it more closely reflected the actual process through which D & L hired employees. The plaintiffs' analyses, *tout au contraire*, grouped the six different job orders into one set of statistics.[19]

■■■ D & L placed job orders with MSES three times during the Grizzard years. On each occasion, D & L sought two types of referral—one order requested regular referrals and one order requested OJT referrals. Dr. Haworth compared the percentages of blacks and whites hired by D & L for each separate job order and found that in only one job order did the difference between the actual and expected number of blacks hired exceed two standard deviations.[20] The district court found, in light of the record as a whole, that this single statistical disparity did not establish a prima facie case of discriminatory intent. We find that the district court's conclusions regarding the statistical analyses of D & L's hiring practices are not clearly erroneous. *See Lewis v. NLRB,* 750 F.2d 1266, 1276 n. 17 (5th Cir.1985) (noting that a single statistically significant disparity "by no means commands an inference of discrimination").

## B

The plaintiffs attempted to buttress their statistical evidence with anecdotal evidence regarding class members whom D & L allegedly did not hire because of their race. While Title VII plaintiffs may use evidence regarding individual instances of discrimination to bolster their class claim, *Bernard,* 841 F.2d at 568, the district court found that D & L did not discriminate in refusing to hire the individuals at issue. This finding is not clearly erroneous. *See* part VIII.B *infra.* Accordingly, the plaintiffs' anecdotal evidence, combined with their statistical evidence, did not establish a prima facie case of disparate treatment.

## V

The plaintiffs introduced statistical, historical, and anecdotal evidence in an attempt to prove that D & L unlawfully discriminated against blacks when promoting employees to leader and foreman positions. The plaintiffs' statistical evidence regarding the promotion claim compared the number of blacks promoted to leader and foreman positions during the pre-suit Grizzard years with the percentage of blacks present in D & L's work force; the plaintiffs also sought to compare the percentage of promotions received by blacks during the pre-suit Grizzard years with the respective percentages for the pre-Grizzard and post-suit periods. D & L, on the other hand, introduced statistics comparing the number of blacks holding leader and foreman positions to the number of blacks holding supervisory positions in Bolivar County. The district court ultimately determined that D & L's statistical analysis was the better one and therefore credited it. Moreover, the district found that the histori-

cant deviation when pool 5 was omitted. *See* note 15 *supra.* Thus, this analysis, which the district court also credited, was not based on a sample significantly smaller than that utilized by the plaintiffs' expert. Therefore, the district court did not clearly err in refusing to find that D & L possessed discriminatory intent with regard to its hiring practices.

19. The plaintiffs' analysis showed that D & L hired 84.4% of white applicants and 50.8% of black applicants referred by the MSES.

20. The plaintiffs again contend that the district court should not have accepted Haworth's analysis because it was based on sample sizes too small to yield meaningful statistical data. Whether a sample is too small to yield meaningful results is a determination made by the district court on a case-by-case basis. *Watson,* 487 U.S. at 995 n. 13, 108 S.Ct. at 2789 n. 13; *Rendon,* 883 F.2d at 397. Under the facts of this case, the district court did not clearly err in accepting D & L's analysis.

cal, anecdotal, and other circumstantial evidence submitted by the plaintiffs did not establish that D & L engaged in a pattern or practice of discrimination. The plaintiffs, of course, challenge these determinations.

## A

A court may infer that an employer engaged in racial discrimination when promoting workers if statistics, when comparing the number of non-whites and whites promoted, demonstrate a gross statistical disparity. *Lewis*, 750 F.2d at 1271. Statistical evidence, however, must be meaningful in light of all the surrounding facts and circumstances. *Pouncy*, 668 F.2d at 1275. "In establishing an inference of discrimination from statistical evidence, the 'required comparison [is] to a *qualified* pool of employees *presumptively eligible* for promotion.'" *Lewis*, 750 F.2d at 1275 (quoting *Pouncy*, 668 F.2d at 803).

### 1

The plaintiffs introduced statistical evidence comparing the percentage of leader and foreman promotions given to blacks during the Grizzard years—23%—to the percentage of black employees in D & L's production work force—80%. According to the plaintiffs, these statistics indicated a pattern of discrimination in the promotion of D & L employees to leader and foreman positions. The plaintiffs contend that this comparison is appropriate because D & L selected leaders and foremen from within the organization.

The district court rejected the plaintiffs' approach as being overbroad because not everyone in D & L's production work force was qualified for promotion. The district court further found that because D & L had hired individuals from outside D & L's work force to be foremen and supervisors, the plaintiffs' approach was too narrow because it excluded individuals outside D & L's production work force who were qualified to be leaders and foremen.[21] We agree that the plaintiffs made the forbidden assumption that all D & L employees were equally qualified for promotion. *See Lewis*, 750 F.2d at 1275 (rejecting the plaintiffs' analysis because they brought into their comparison "employees who are not to be considered for promotion"); *Pouncy*, 668 F.2d at 803 (refusing to infer that an employer discriminated against black employees in awarding promotions simply because the plaintiffs demonstrated that the percentage of black employees promoted was "far less" than the percentage in black employees in the employer's work force). Consequently, the district court did not err in finding the plaintiffs' statistical evidence for leader and foreman promotions unpersuasive.

### 2

The plaintiffs also introduced statistical evidence showing that blacks constituted 64% of persons promoted to leader and foreman positions during the pre-Grizzard and post-suit periods, but only 23% of those promoted during the pre-suit Grizzard period. The plaintiffs also note, however, that during the pre-Grizzard period, blacks apparently received favorable treatment with regard to promotions: whites worked on average for 71.8 months before promotion while blacks

21. The district court also found that even if it was proper to use the number of blacks in D & L's production work force as a benchmark, the evidence did not establish a prima facie case of discriminatory conduct:

[W]hen comparing the percentage of blacks in the leader, foreman, and supervisor classifications at the company to the percentage of blacks in the production workforce, the ratio of the percentage [of] black[s] in supervisory categories (42%) to the percentage of blacks in production workforce (80%) is much higher than the similar proportion of the Bolivar County figure of 19 percent black in supervisors of production workers, when compared

with the blue-collar (60.7%) and manufacturing (58.2%) rates. Stated otherwise, if blacks at [D & L] were represented in supervision in the same percentage as in other industries in Bolivar County relative to the percentage in the production workforce, the benchmark would only be 25%, or seventeen percentage points less than what it has been. Thus, even from the perspective of plaintiffs, the defendant's performance relative to its production workforce far exceeds the performance of other Bolivar County companies.

Record Excerpts at 91. As we uphold the district court's determination on other grounds, we need not reach this issue.

worked on average only 43 months. *See also* note 29 *infra*. Because of the bias in favor of blacks during the pre-Grizzard period, the district court found it unhelpful to compare statistics from that period with statistics from the post-Grizzard periods. *Cf. Lewis*, 750 F.2d at 1275 n. 14 (noting that an employer's affirmative action program could skew statistical analyses in disparate treatment cases). Because D & L was not required to continue the preferential treatment given black employees during the pre-Grizzard period, *see United Steelworkers v. Weber*, 443 U.S. 193, 205–06, 99 S.Ct. 2721, 2728, 61 L.Ed.2d 480 (1979), the district court thus did not err in disregarding the plaintiffs' statistical evidence regarding the pre-Grizzard period.

**3**

 In finding no evidence of discriminatory conduct, the district court accepted D & L's statistical evidence, which compared the percentage of black supervisors at D & L to the percentage of black supervisors county-wide.[22] We believe that the district court erred in comparing the total number of black supervisors at D & L to the number of black supervisors county-wide. An employer cannot escape liability under Title VII by demonstrating that, at the bottom line, minorities are represented in supervisory capacities at non-discriminatory levels. *See Wards Cove*, 490 U.S. at 655–57, 109 S.Ct. at 2124; *Connecticut v. Teal*, 457 U.S. 440, 450, 102 S.Ct. 2525, 2532, 73 L.Ed.2d 130 (1982). Thus, the relevant comparison is between the number of blacks promoted during the pre-suit Grizzard years and the number of blacks that statistically should have been promoted in the absence of any discrimination.[23]

 The plaintiffs have demonstrated that blacks received 23% of all promotions during the pre-suit Grizzard years. At the same time, blacks constituted 19.1% of the supervisors in production-related occupations in Bolivar County.[24] The district court, because blacks were represented in D & L's work force in a ratio higher than statistically predicted,[25] inflated the 19.1% figure to 25%—i.e., blacks statistically should have received 25% of all promotions to leader and foreman positions. Because the number of blacks who received promotions is not statistically different from the number of blacks expected to receive promotions,[26] the district

**22.** D & L demonstrated that blacks constituted 42% its leaders, foremen, and supervisors during the Grizzard years. Based on this evidence, the district court found that the percentage of black employees in supervisor positions at D & L "was not only well within but beyond the range of what would be expected when compared with the relevant labor market, which, in this case, is the percentage of blacks in supervision in production occupations."

**23.** However, a demonstration by the employer that, at the "bottom-line," blacks were overrepresented in its work force still is relevant to the ultimate determination whether the employer engaged in a pattern or practice of discrimination. *See St. Mary's Honor Center v. Hicks*, — U.S. —, —, 113 S.Ct. 2742, 2751, 125 L.Ed.2d 407 (1993).

**24.** The plaintiffs challenge the district court's use of this figure, arguing that it encompassed only supervisors of "precision" production occupations, such as metal working occupations, apprentices, boilermakers, and sheet metal workers. On direct examination, however, D & L's expert, Dr. Haworth, testified that leaders and foremen at D & L would be included in the 19.1%-black figure. The district court did not err in resolving this credibility dispute in favor of

D & L. *Anderson*, 470 U.S. at 575, 105 S.Ct. at 1512. The district court reasonably concluded that the figure was sufficiently similar to the occupation of D & L supervisors, especially when the plaintiffs failed to introduce any evidence to the contrary.

**25.** At all times during the relevant period, D & L's workforce was more than 70% black, and the production workforce was approximately 80% black. 1980 Census data showed that the civilian labor force in Bolivar County was 51.9% black, the manufacturing labor force was 58.2% black, and the blue-collar labor force was 60.7% black.

**26.** Applying the mathematical formula suggested in *Hazelwood School District v. United States*, 433 U.S. 299, 97 S.Ct. 2736, 53 L.Ed.2d 768 (1977), the difference between the number of blacks expected to receive promotions and the number who actually did receive promotions is not statistically significant (total of 22 promotions):

$$\text{Number of S/D} = \frac{O - NP}{\sqrt{NP\,(1-P)}},$$

S/D = Standard Deviations
O = Actual number of blacks who received a promotion

court did not err in failing to find an inference of disparate treatment with regard to D & L's promotion practices. *See Terrell v. University of Tex. Sys. Police,* 792 F.2d 1360, 1362 n. 3 (5th Cir.1986) ("When the judgment of the district court is correct, it may be affirmed on appeal for reasons other than those given or relied on below."), *cert. denied,* 479 U.S. 1064, 107 S.Ct. 948, 93 L.Ed.2d 997 (1987).

**B**

■ The plaintiffs contend that because D & L based its promotion decisions on subjective criteria, D & L could have failed to promote blacks for discriminatory reasons. The district court rejected the plaintiffs' argument. A promotional system that is based upon subjective criteria is not "discriminatory per se." *Page v. U.S. Indus., Inc.,* 726 F.2d 1038, 1046 (5th Cir.1984); *see also Watson,* 487 U.S. at 990, 108 S.Ct. at 2786 ("[A]n employer's policy of leaving promotion decisions to the unchecked discretion of lower level supervisors should itself raise no inference of discriminatory conduct."). However, "promotion systems utilizing subjective evaluations by all white supervisors" can be evidence of discrimination in disparate treatment cases. *Payne v. Travenol Laborato-*

*ries, Inc.,* 673 F.2d 798, 827 (5th Cir.1982); *Lewis,* 750 F.2d at 1276.

■ This case is distinguishable from our prior holdings, however, because the D & L supervisors who evaluated and promoted employees were both black and white. As the district court found,

> [w]hile the subjectivity of the criteria of attitude and commitment could result in racial disparity in the potential for promotion, it is clear from the record evidence that the individuals recommended or considered for promotion included black individuals recommended by white foremen and supervisors, white individuals recommended by black foremen and supervisors, and individuals recommended by both.

Record Excerpts at 90; *cf. St. Mary's Honor Ctr. v. Hicks,* —— U.S. ——, ——, 113 S.Ct. 2742, 2751, 125 L.Ed.2d 407 (1993) (noting that evidence in a hiring case tending to negate a finding of discrimination includes the fact that the hiring officer is of the same minority group as the plaintiff). The district court's finding is supported by the evidence.[27] Accordingly, the district court did not err in refusing to find that the subjective component of D & L's promotion policy constituted evidence of discriminatory intent.[28] *See Ber-*

---

N = Number of workers who received a promotion

P = Probability of a black being promoted from the relevant population

Thus, $\dfrac{5 - (22 \times 25\%)}{2.03} = -0.25$

*See also Lopez v. Laborers Int'l Union Local No. 18,* 987 F.2d 1210, 1215 n. 14 (5th Cir.1993); *Lewis,* 750 F.2d at 1274 n. 12. Because the difference is less than 2 standard deviations, it is not statistically significant. We also note that if we use 42%—the number of D & L leaders, foremen, and supervisors who were black—in place of 25%, the difference between the number of blacks promoted and the expected number (9.24) still is not statistically significant (1.84 standard deviations). Consequently, the plaintiffs failed to prove a prima facie case of discrimination.

27. Grizzard recommended to his supervisors that they consider Harold Brown, Richard Grant, Marilyn Holmes, and Vera Watson—all black employees—for promotion. Richard Williams, a black supervisor, testified that he offered one promotion to four black employees, who rejected it, before offering it to Robert LaPresto, a white

employee. Charlie West, another black supervisor, recommended James Haney, a white employee, for promotion. L.C. Taylor, a black shift supervisor, recommended Chris Strickland, a white employee, for promotion while Howard Watson recommended Vera Watson, a black employee, for a leader position. E.W. Tolbert, a black supervisor, testified that he was involved in promoting Randy Daniels, a white employee who was offered a promotion only after six black employees had turned it down. *See also* part V.C *infra.*

28. We also note that D & L substantially increased the number of blacks holding salaried supervisor positions, which the plaintiffs exclude from their claim that D & L discriminated against black employees with regard to promotions. Grizzard promoted E.W. Tolbert from a shift supervisor position to production manager, the second-in-command at the plant. Charlie West then took over Tolbert's position as a shift supervisor. Grizzard also promoted Richard Williams from supervisor to department head, Vera Watson to foreman and then to shift supervisor, and Harold Brown, Charlie Lofton, and Sylvester Parker from foremen to salaried supervisors.

*nard,* 841 F.2d at 547 (holding that an employer's unwritten and subjective standards for promotion were not discriminatorily applied).

## C

The plaintiffs introduced evidence of the comparative seniority of white and black employees prior to promotion to support their argument that D & L was discriminating against blacks by promoting less senior whites.[29] The district court rejected this evidence because it ignored that more senior black employees turned down several promotions later given to less senior white employees.[30]

 The average length of time between promotions may be relevant in proving discrimination by an employer. *See Pouncy,* 668 F.2d at 804. However, we agree with the district court that the statistics submitted by the plaintiffs are fatally flawed because they overlook the black employees who turned down promotions later offered to white employees. *See Trevino,* 811 F.2d at 902 (finding that the plaintiffs' statistics demonstrating a "significant disparity between Hispanics and non-Hispanics for the total elapsed time from the date of hire" to promotion was "not compellingly persuasive evidence" of discrimination). For example,

Robert LaPresto, a white employee, was promoted to leader after being employed by D & L for approximately four months. However, the position was first offered to four black employees who rejected it. D & L promoted James Haney, another white employee, to leader nine months after hiring him, but only after two black employees first declined the offer of promotion. Six black employees rejected a promotion given to white employee Randy Daniels, whom D & L promoted to leader less than two months after his employment began.[31] We also note that during the post-suit period, during which blacks received 64% of the promotions to leader and foreman and about which the plaintiffs do not complain, blacks worked on average 154.9 months before promotion while whites worked only 51 months. This comparison demonstrates that statistics regarding the relative seniority of workers promoted by D & L cannot support a finding of disparate treatment. *Cf. Pouncy,* 668 F.2d at 803 (finding that a discrepancy between the mean salaries of black and white employees could be explained by "any number of nondiscriminatory factors," including different skill levels, previous training, and experience). Consequently, like the district court, we refuse to infer from this evidence that D & L's pro-

**29.** According to the plaintiffs, white employees between 1978 and September 1982 worked for D & L on average 71.8 months before promotion; black employees on average worked only 43.2 months before promotion. During the presuit Grizzard years, the plaintiffs contend that whites worked on average 15.1 months before promotion and blacks worked on average 84.8 months. We note, however, that using plaintiffs' exhibit 144, whites apparently worked on average 51 months before promotion. While we have not recomputed every number that the plaintiffs cite in their brief, we point out this discrepancy to demonstrate the problems that exist with the plaintiffs' statistical analysis.

**30.** The district court also stated that the plaintiffs' evidence

"paint[ed] a distorted picture which attaches responsibility to Mr. Grizzard for the years before his arrival that a black employee was not being promoted instead of giving him credit for promoting black employees his predecessors overlooked. *From this perspective, the* court finds that the only way Grizzard could have passed muster was to continue to bypass

the senior black employees in favor of recently-hired black employees.... Moreover, plaintiffs have chosen figures which attempt to compare the pre- and post-Grizzard periods for promotions, conveniently ignoring the fact that in the pre-Grizzard period blacks were given more favorable treatment—the system was not neutral. Blacks were on average less senior than their white counterparts by some twenty-eight months."

Record Excerpts at 101–02.

**31.** The plaintiffs contend that D & L knew that the black employees would turn down the promotion offers. The district court, however, credited the testimony of E.W. Tolbert—D & L's production manager—that the black employees who turned down promotion offers were offered multiple promotions because they were above-average employees and their supervisors felt that they might accept a new offer, an offer of a different job, or an offer made by someone else. The district court was within its province to resolve credibility disputes, *Anderson,* 470 U.S. at 575, 105 S.Ct. at 1512, and the district court's finding on this issue is not clearly erroneous.

motion practices unlawfully disfavored black employees.

### D

■ The district court considered evidence put forward by the plaintiffs with regard to alleged individual instances of discrimination and concluded that D & L gave legitimate reasons why it did not promote most of the individuals at issue. The district court also found that D & L did not promote the other individuals simply because they were overlooked or did not come to the attention of management.[32] *See* part VIII.C *infra.* Thus, the anecdotal evidence did not, as the plaintiffs assert, support a finding that D & L engaged in a pattern or practice of discrimination. *See Texas Dept. of Community Affairs v. Burdine,* 450 U.S. 248, 259, 101 S.Ct. 1089, 1097, 67 L.Ed.2d 207 (1981) ("The fact that a court may think that the employer misjudged the qualifications of the applicants does not in itself expose him to Title VII liability...."); *Odom v. Frank,* 3 F.3d 839, 849–50 (5th Cir.1993) (noting that the perpetuation of a "good old boy" network does not amount to racial discrimination). Consequently, the district court did not clearly err in concluding that the plaintiffs' anecdotal evidence did not support their claim of disparate treatment. *See Lewis,* 750 F.2d at 1276–77 (finding that anecdotal evidence supported a finding only of isolated instances of discrimination).

### E

■ The plaintiffs further contend that the district court erred in rejecting their attempt to buttress their statistical evidence of discrimination with evidence regarding D & L's history of discrimination. The plaintiffs argued that D & L's supervisors both used racially derogatory language in speaking to black employees and physically abused them, without any repercussions from upper management. After reviewing the anecdotal evidence presented by the plaintiffs, the district court concluded that D & L at no time encouraged or condoned any mistreatment of black employees by supervisors. Specifically, the district court found that

> [t]he sum total of the evidence with regard to these allegations of what constitutes a claim of hostile environment in the form of disparate treatment of black employees amounts, at best, to proof of isolated acts of the use of vulgar or racially derogatory language by no more than two or three company officials and a single instance of physical contact between a company official and a single black employee, all occurring over a period of three or more years. What is also abundantly clear is that when reported to the appropriate company officials, every complained of incident was immediately followed by affirmative company action in the form of apologies to the employees involved, counseling of the managers involved, and/or discipline of those management officials. Moreover, the plaintiffs' allegations relate to the time period after the arrival of the Plant Manager James Grizzard, with there being not a scintilla of evidence that Grizzard participated in or condoned any of the complained of acts, with the exception of possibly two instance of the use of vulgar language, both of which, under the undisputed circumstances, the court finds to have been justified, and one, about which the union filed a grievance, for which Mr. Grizzard apologized.[33]

---

**32.** The plaintiffs contend that the district court's findings would allow D & L to discriminate against many black employees without hindrance as long as the Company treated other blacks the same as white employees. However, "this attack overstates the impact of the district court's ... analysis." *Lewis,* 750 F.2d at 1274 n. 11. D & L introduced evidence demonstrating that legitimate reasons lay behind the delayed promotions for some blacks and the relatively early promotions for some whites. This evidence, as the district court properly found, tended to negate the plaintiffs' attempted showing that a pattern

or practice of discrimination in D & L's promotion policies existed. *Id.*

**33.** Plaintiff Daniel Anderson testified that upon returning to work from a doctor's examination, his supervisor refused to let him take a break that he had missed. Anderson then clocked out and left the plant. Grizzard confronted Anderson the next day, asking him "who in the hell did he think he was to be able to just leave because he couldn't take his break." On the second occasion, Grizzard used the term "son-of-a-bitch" when he discovered that someone had

Record Excerpts at 129–30. The district court further found that some of the individuals who alleged that D & L officials used racially derogatory language were not credible.

It is within the province of the district court to resolve credibility disputes. *Anderson,* 470 U.S. at 564, 105 S.Ct. at 1504. Moreover, the "mere utterance of an ethnic or racial epithet which engenders offensive feelings in an employee" is not indicative of a pattern or practice of racial discrimination in violation of Title VII. *Rogers v. EEOC,* 454 F.2d 234, 238 (5th Cir.1971), *cert. denied,* 406 U.S. 957, 92 S.Ct. 2058, 32 L.Ed.2d 343 (1972). After undertaking an independent review of the record, we conclude that the district court did not err in finding that the evidence demonstrated, at best, only isolated instances of racially motivated acts insufficient to establish class-wide disparate treatment.[34] *See Bernard,* 841 F.2d at 569 (holding that the anecdotal testimony of the plaintiffs' witnesses did not establish class-wide disparate treatment).

## VI

The class plaintiffs finally argue that the district court erred in finding that D & L did not discriminate against blacks when giving temporary upgrade assignments to general maintenance and rack maintenance positions.[35] They contend that the statistical evidence demonstrated a gross disparity in the treatment of white and black employees, thus establishing a prima facie case of discrimination.[36] It does not appear that the plaintiffs presented any expert testimony explaining the meaning or statistical significance of this evidence. Consequently, our review of the evidence has been unduly hampered by the plaintiffs' failure to establish whether their statistics were meaningful or significant in light of the particular facts of this case. *See Teamsters,* 431 U.S. at 340, 97 S.Ct. at 1857 (noting that the "usefulness [of statistics] depends on all of the surrounding facts and circumstances"). Nevertheless, after closely reviewing the plaintiffs' evidence, we conclude that the plaintiffs failed to establish a prima facie case of discrimination.

removed a notice from the company bulletin board. When the union filed a grievance regarding the incident, Grizzard issued a written apology that explained his comments were not directed to any of the employees within earshot.

**34.** We also note that two black salaried supervisors—Charlie West and E.W. Tolbert—and a black foreman—Monroe O'Neal—testified that Grizzard was "a good man," "a super plant manager," and was not prejudiced. Moreover,

Tolbert stated that Howard Watson was an "outstanding production manager" who also was not prejudiced.

**35.** General and rack maintenance positions are two of the job classifications at D & L's plant considered to be "craft" positions.

**36.** The plaintiffs claim that the following statistical evidence established a prima facie case of discrimination:

Table 6. Temporary Upgrades to General Maintenance: Percentage of Total Hours Assigned

| Time Period | % White | % Black |
| --- | --- | --- |
| Pre–Grizzard Period [1/15/81–10/2/82] | 11.60% | 88.40% |
| Grizzard Pre–Suit Period [10/2/82–7/4/85] | 92.59% | 7.40% |
| Post–Suit Period [7/5/85–9/19/85] | 46.60% | 53.40% |

Table 7. Temporary Upgrades to Rack Maintenance: Percentage of Total Hours Assigned

| Time Period | % White | % Black |
| --- | --- | --- |
| Pre–Grizzard Period | 85.40% | 14.61% |
| Grizzard Pre–Suit Period | 100.00% | 0.00% |
| Post–Suit Period | 0.00% | 100.00% |

Brief for Plaintiffs at 66. In presenting these statistics, the plaintiffs stated only that the statistics were "drawn from [the] stipulated data." After much searching, we discovered that the raw data undergirding these statistics was presented to the district court through a joint stipulation.

Eleven employees, three of whom were black, received temporary upgrades to general maintenance jobs during the Grizzard pre-suit period. During this period, two white employees—William Myers and James Partridge—received 68% of the total temporary-upgrade hours. By comparison, two black employees—James Triplett and Alfred Kemp, Sr.—received approximately 88% of all temporary-upgrade hours during the pre-Grizzard period; in the post-suit period, one white employee—Robert Haynes, Jr.—and one black employee—Arthur Perry—received approximately 94% of all temporary-upgrade hours. The plaintiffs introduced no evidence demonstrating that other individuals desired or were qualified for temporary-upgrade positions.[37] Consequently, we have nothing with which to compare the plaintiffs' statistics. As a result, the statistics are meaningless.[38]

Other evidence supports the district court's determination that D & L did not discriminate in giving employees temporary upgrade assignments. For example, the percentage of blacks in permanent craft positions during the Grizzard years ranged from 66.7% to 73.7%. During the immediately preceding years, blacks comprised 57.1% to 63% of the employees in craft positions.[39] Moreover, D & L during the Grizzard years awarded seven out of the eight permanent promotions to craft positions to black employees. Moreover, Alfred Kemp, one of the black employees who received no temporary upgrades during the Grizzard pre-suit period but did during both the pre-Grizzard and post-suit periods, testified unequivocally that D & L was a good place to work and always

treated him fairly.[40] We also note the lack of evidence regarding the number of employees, black and white, who received temporary upgrades to craft positions in non-maintenance departments. *See Wards Cove,* 490 U.S. at 651–53, 109 S.Ct. at 2122 (noting that plaintiffs should not unnecessarily segment the employer's work force in an attempt to prove discrimination). We therefore agree with the district court's conclusion that D & L did not discriminate in selecting employees for temporary upgrade assignments in the rack maintenance and general maintenance departments.

### VII

The statistical evidence presented by the plaintiffs does not present the gross statistical disparity that, when considered in light of the entire record, would require a reversal of the district court's ultimate findings that no pattern of discrimination existed with regard to D & L's hiring and promotion practices. Nor is the historical and anecdotal evidence introduced by the plaintiffs sufficient to support a finding of disparate treatment. Accordingly, we **AFFIRM** the district court's judgment on the class claims.

### VIII

■ The district judge rejected the individual claims of various plaintiffs challenging the treatment they received pursuant to D & L's hiring, promotion, and termination policies. "In a disparate treatment case involving an individual, the plaintiff initially has the burden of showing a prima facie case of

---

**37.** For example, the plaintiffs did introduce evidence pertaining to the qualifications of Thomas Hardy and Daniel Anderson, Jr. for temporary upgrade assignments. These two individuals, however, were not qualified for such assignments. *See* part VIII.D *infra.*

**38.** The plaintiffs' statistics regarding the number of rack-maintenance temporary-upgrade hours worked by blacks suffer from the same problems. For example, out of the three employees given temporary upgrades in the pre-Grizzard period, a white employee—Willie Mullen—worked approximately 82% of the total hours. In the Grizzard pre-suit period, one white employee—Edward Otto—worked 100% of the hours. In the post-suit period, one black employee—Alfred

Kemp, Sr.—received 95% of the temporary upgrade hours.

**39.** The 1980 census figures for Bolivar County indicate that blacks held only 33.4% of all precision production craft and repair positions county-wide.

**40.** Howard Watson, who had to approve Kemp's availability for temporary assignments, supplied a legitimate, nondiscriminatory reason for Kemp's lack of temporary upgrade assignments during the Grizzard pre-suit period. Watson testified that he sometimes refused to approve Kemp for temporary upgrades because Kemp was needed in a production department.

discrimination." *Carroll*, 708 F.2d at 195. A plaintiff meets this initial burden by demonstrating

> (i) that he belongs to a racial minority; (ii) that he applied and was qualified for a job for which the employer was seeking applicants; (iii) that, despite his qualifications, he was rejected; and (iv) that, after his rejection, the position remained open and the employer continued to seek applica[tions] from persons [who possessed the plaintiff's] qualifications.

*McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802, 93 S.Ct. 1817, 1824, 36 L.Ed.2d 668 (1973). "Establishment of the prima facie case in effect creates a presumption that the employer unlawfully discriminated against the employee." *Burdine*, 450 U.S. at 254, 101 S.Ct. at 1094. If the plaintiff establishes a prima facie case of discrimination, "the burden shifts to the employer to rebut the presumption of discrimination by producing evidence that the plaintiff was rejected, or someone else was preferred, for a legitimate, non-discriminatory reason." *Carroll*, 708 F.2d at 195. If the employer "carries this burden of production, the presumption raised by the prima facie case is rebutted" and drops from the case. *Burdine*, 450 U.S. at 255 & n. 10, 101 S.Ct. at 1095 & n. 10. "The plaintiff then has 'the full and fair opportunity to demonstrate,' through presentation of his own case and through cross-examination of the defendant's witnesses, 'that the prof-

fered reason was not the true reason for the employment decision,' and that race was." *St. Mary's*, ⸺ U.S. at ⸺, 113 S.Ct. at 2747 (quoting *Burdine*, 450 U.S. at 256, 101 S.Ct. at 1095). The plaintiff at all times bears the burden of persuading the court that he or she was the victim of intentional discrimination.[41] *Id.* ⸺ U.S. at ⸺, 113 S.Ct. at 2747–48.

### A

■ A number of individual plaintiffs claim that D & L unlawfully discriminated against them on the basis of race by refusing to give them applications during the Grizzard years—October 1982 through April 1986. The district court found that some of the plaintiffs were not credible because, during the time they allegedly could not obtain applications, other blacks were given applications.[42] Furthermore, the district court found that D & L properly refused to give many of the plaintiffs applications because the Company either was not hiring when the plaintiffs were seeking applications or was hiring but had already received a sufficient number applications for the positions to be filled. The district court's findings are not clearly erroneous. An extensive review of the record has convinced us that it contains no evidence indicating that the plaintiffs were not given applications because of their race.[43] The only evidence supporting the

---

**41.** "When a case has been fully tried on the merits, the adequacy of a party's showing at any particular stage of the *McDonnell Douglas* ritual is unimportant. We focus our inquiry on whether the record contains evidence upon which a reasonable trier of fact could have concluded as the jury did." *Molnar v. Ebasco Constructors, Inc.*, 986 F.2d 115, 118 (5th Cir.1993) (citation omitted).

**42.** For example, plaintiff Chris Harris testified that she and two other blacks were able to obtain applications in October 1984. Plaintiff Linda Davis testified that although she was not able to procure an application, her sister and another person obtained applications. Plaintiff Bobbie Sharp testified that while she was not able to obtain an application in mid–1984, she did obtain an application from D & L in mid–1983; Sharp also testified that on the latter occasion, she saw other blacks filling out applications. Thomas Hardy, a D & L employee, testified that his wife procured an application from D & L in

1984, while Malcolm Smith testified that he obtained an application October 2, 1982 and was hired the next month. Kimroy Williams, a D & L employee, testified that three of his relatives applied for employment with D & L during the Grizzard years.

**43.** The plaintiffs also complain that the application procedures instituted by Haynes when she became personnel manager—making all applicants come to the plant, refusing to allow employees to take blank applications home with them—were intended to harm potential black applicants. However, D & L demonstrated that it had legitimate, nondiscriminatory reasons for changing the application process. For example, Haynes testified that when she allowed employees to take applications from the plant, many were never returned. She also stated that making potential employees come to the plant to obtain and complete applications helped to ensure that the people applying actually wanted the job, had transportation to and from the plant,

plaintiffs' allegations that D & L refused to give blacks employment applications is the plaintiffs' unsupported assertions concerning their collective belief that D & L discriminated against blacks.[44] Under D & L's application policy, *see* part I.A *supra*, there were legitimate, nondiscriminatory reasons why D & L did not give applications to the plaintiffs. Because the plaintiffs failed to demonstrate that race was the true reason for D & L's refusal to give them applications, we uphold the district court's finding that D & L did not discriminate against the plaintiffs. *See Odom v. Frank*, 3 F.3d 839, 849 (5th Cir. 1993) (holding that anecdotal evidence and mere speculation will not support a finding that an employer followed an unwritten "policy" of discrimination); *Carroll*, 708 F.2d at 195–96 (noting that the mere suspicion of discrimination is not sufficient to establish disparate treatment).

### B

■■■ Plaintiffs Chris Harris and Bobbie Sharp contend that D & L unlawfully discriminated against them on the basis of race by refusing to hire them for production positions. The district court found that D & L did not hire Harris and Sharp for valid, race-neutral reasons. For example, Harris, who applied when D & L was hiring only for the night shift, indicated on her application that she attended afternoon and evening classes at a local college. Haynes testified that she believed she did not hire Harris because of the conflict between Harris's classes and the shift for which she was hiring. The district court noted that although Haynes's explanation was not absolute, no evidence suggested that race affected Haynes's decision not to hire Harris. This finding is not clearly erroneous. *See Odom*, 3 F.3d at 845 ("Although Strader's testimony ... was less than absolute, it constituted at least *some* evidence.

More significantly, it was uncontradicted. As Odom adduced *no* evidence favorable to his position ..., we are compelled to accept Strader's legitimate, non-discriminatory explanation...."); *cf. St. Mary's*, —— U.S. at —— n. 5, 113 S.Ct. at 2751 n. 5 ("The notion that every reasonable employer keeps 'personnel records' on people who never became personnel, showing *why* they did not become personnel (*i.e.*, in what respects all other people who were hired were better) seems to us highly fanciful—or for the sake of American business we hope it is."). Likewise, Sharp failed to adduce any evidence indicating that D & L unlawfully considered her race when deciding not to hire her. Moreover, at the same time Harris and Sharp were not hired, D & L hired other blacks as production workers. Thus, the district court's finding that D & L did not discriminate against her is not clearly erroneous. *See Carroll*, 708 F.2d at 195 (noting that the mere suspicion of discrimination does "not establish disparate treatment").

■■■ Plaintiffs Nathaniel Cannon, Michael O'Neal, and Gregory Townsend contend that D & L unlawfully discriminated against them by refusing to rehire them after they had been laid off.[45] The district court found that these plaintiffs adduced no evidence indicating that race was a factor in D & L's decision not to rehire them. In fact, the record indicates that D & L rehired twenty-two blacks, and only fourteen whites, during the Grizzard years. We hold that the district court did not err in finding that D & L did not rehire Cannon, O'Neal, and Townsend because of legitimate, race-neutral reasons. *See Carroll*, 708 F.2d at 195 (noting that the mere suspicion of discrimination does "not establish disparate treatment").

### C

■■■ Plaintiffs Moses Coleman, Richard Grant, Earnest Hall, Robert Melvin, Alexan-

---

and could read and write. The district court credited her testimony, and this finding is not clearly erroneous.

**44.** For example, although Miller Slaughter testified that D & L did "a lot of discriminating," she would not consider a company that has a large percentage of black employees to be acting discriminatorily. Melvin Shaw testified that he was discriminated against simply "because [he] knew

[he] was qualified to work [at D & L] but ... didn't even receive an application." Moreover, the plaintiffs uniformly testified that neither Haynes nor D & L's security guards treated them in a harsh manner or directed derogatory or vulgar language at them.

**45.** Cannon, O'Neal, and Townsend were not entitled to be recalled under the terms of D & L's collective bargaining agreement.

der Smith, and Kimroy Williams claim that D & L, in failing to promote them to leaders and foremen, discriminated against them on account of their race. The district court found that the plaintiffs failed to demonstrate that race played any part in D & L's failure to promote them. This finding is supported by the record evidence.

In selecting leaders and foremen, D & L considered the employee's attitude, work record, work experience, leadership abilities, willingness to help other employees, commitment to the Company, and seniority to be very important. The record reflects that each plaintiff was lacking in one or more of these attributes during the Grizzard years. *See Davis v. Chevron U.S.A., Inc.,* 14 F.3d 1082, 1087 (5th Cir.1994) (noting that to establish a prima facie case of discrimination, an applicant must be qualified for the sought position *at the time* he or she applies for it). For example, Gerald Bardwell, Coleman's supervisor, stated that Coleman, when temporarily filling in for foremen, was unable to handle the job and had employees "goofing off on him." Howard Watson testified that department supervisors never recommended Coleman for promotion. Additionally, both Grant and Hall had both turned down previous offers of promotion to leader positions, indicating a lack of commitment to D & L.[46] Charlie West, a black supervisor, testified that he did not consider Grant for one promotion because he did not know Grant. Byron Kyle, a department superintendent, testified that Grant did not have any leadership abilities.[47] Richard Williams, a black supervisor, and Howard Watson testified that Melvin and Kimroy Williams did not show any interest in being promoted and did only enough work to get by, thereby demonstrating little desire for advancement and no commitment to the Company.[48] Tommy Lucas, a foreman in the paint department and former

union steward, testified that Smith had an attitude problem.

The plaintiffs failed to demonstrate that their race played any role in D & L's failure to promote them. *See Carroll,* 708 F.2d at 196 (rejecting a claim that an employee was discriminatorily denied promotion because his supervisors testified that his attitude and lack of dependability were the actual reasons); *Pouncy,* 668 F.2d at 795 (rejecting an employee's promotion claim because the employee did not possess the initiative or the ability to communicate with and train his coworkers). At most, the plaintiffs proved that D & L may have overlooked one or more of them when considering potential candidates for promotion. Such a showing is insufficient to prove discrimination. *Cf. Odom,* 3 F.3d at 849–50 (noting that the perpetuation of a "good old boy" network does not amount to racial discrimination). Accordingly, the plaintiffs failed to prove that D & L did not promote them on account of their race.

### D

Daniel Anderson, Jr. and Tommy Hardy argue that D & L refused to give them temporary upgrade assignments in the general maintenance or rack maintenance departments because of their race. Welding experience was necessary for many of the tasks performed by general maintenance employees, and welding was the primary duty of rack maintenance employees. The district court found that D & L did not give Anderson and Hardy temporary upgrade assignments because they lacked the necessary experience to work in the maintenance departments.

Both Anderson and Hardy testified that they had only a limited amount of welding

---

46. Hall challenges D & L's assertion that he rejected an offer of a promotion. However, Grizzard and Howard Watson, the production manager at the time, both testified that Hall did turn down a promotion because the promotion would have required Hall to work on the second shift. The district court credited this testimony over that of Hall. This determination was not clearly erroneous. *See Anderson,* 470 U.S. at 574, 105 S.Ct. at 1511–12.

47. Moreover, Grant admitted that he was not qualified for promotion until 1985. However, he filed an EEOC charge in 1984 alleging that D & L failed to promote him for discriminatory reasons. Grant explained this inconsistency by stating that he did not read the EEOC charge before he signed it and thus had no idea what the charge alleged.

48. After D & L noticed a change in Williams's attitude in 1987, the Company promoted him.

experience.[49] Moreover, they presented no evidence demonstrating that what little welding experience they had qualified them to perform the duties of general and rack maintenance employees. Finally, they introduced no evidence suggesting that any white employee who received an upgrade was unqualified (or less qualified than the plaintiffs). Because the district court's finding that Anderson and Hardy were not qualified to receive temporary upgrades is not clearly erroneous, the district court's conclusion that Anderson and Hardy failed to establish a prima facie case of discrimination is supported by the evidence.

Anderson further contends that D & L discriminated against him by not permanently promoting him to the rack maintenance department. Anderson and James Bruce, a white employee, submitted bids for a permanent rack maintenance position. Both Anderson and Bruce were interviewed. The notes of the interviewer indicated that he considered Anderson's limited welding experience, Bruce's more extensive welding experience, Anderson's "poor attendance," and Bruce's "very good" attendance in determining who to recommend for the promotion.[50] Moreover, the notes also indicate that a black employee with more seniority than Bruce turned down the job. Thus Anderson did not establish a prima facie case of discrimination because he was not qualified for the promotion which he sought.[51] Moreover, even if Anderson did establish a prima facie case, D & L demonstrated by a preponderance of the evidence that it rejected Anderson for legitimate reasons. Accordingly, the district court properly found that Anderson failed to demonstrate that he was the victim of discrimination.

### E

Four plaintiffs—Belinda Cox, Robert Haywood III, Synovia Jackson and Jesse Overstreet—contend that the district court erred in finding that D & L did not discharge black employees under its garnishment policy, *see* part I.D *supra*, in retaliation for filing EEOC charges.[52] To establish a prima facie case of retaliatory discharge under § 2000e–3(a) of Title 42,[53] a plaintiff must demonstrate (1) that he engaged in activity protected by Title VII, (2) that an adverse employment action occurred, and (3) that a causal link between participation in the protected activity and the adverse employment decision exists. *Shirley v. Chrysler First, Inc.*, 970 F.2d 39, 42 (5th Cir.1992). Once a plaintiff establishes a prima facie case, the employer bears the burden of articulating some legitimate, nondiscriminatory reason for its action. *Id.* If the defendant does so, the employee bears the ultimate burden of showing that the reasons given by the employer were a pretext for retaliation. *Id.*

The parties appear to agree that the plaintiffs passed the first two prongs of the retaliation test, as they filed EEOC charges and subsequently were terminated from their

**49.** Hardy testified that he had done some welding in an auto body shop and took high school welding classes in the early 1970s. Anderson also admitted that he had little welding experience, although he had taken "mechanics" classes in high school.

**50.** The plaintiffs, without citing any authority, contend that the district court erred in relying on these notes because the interviewer never testified. However, the notes were attached as an exhibit to a joint stipulation submitted to the court by both parties. Because the stipulation stated that both it and the attached "exhibits shall be received in evidence at the trial of this case," the plaintiffs' contention is without merit.

**51.** Anderson also argues that he had experience "fixing" D & L machines and therefore was qualified for the promotion. However, Wallace Bailey, the maintenance department superintendent, testified that Anderson's experience "fixing" machines simply involved routine preventive maintenance duties performed by all D & L employees and was not similar to the duties performed by maintenance department employees.

**52.** The plaintiffs do not appeal the district court's conclusion, based on our holding in *Carter v. South Central Bell*, 912 F.2d 832 (5th Cir.1990), *cert. denied*, 501 U.S. 1260, 111 S.Ct. 2916, 115 L.Ed.2d 1079 (1991) that their claims of retaliatory discharge were not actionable under § 1981.

**53.** This section prohibits an employer from "discriminat[ing] against any of his employees ... because [the employee] has made a charge ... under this subchapter." 42 U.S.C. § 2000e–3(a).

positions.[54] They disagree, however, about the causal link between their terminations and the filing of the EEOC charges. The plaintiffs argue that but for the filing of the EEOC complaints, they would not have been fired. D & L counters by arguing that there is no causal connection between the plaintiffs' terminations and their protected activities. D & L further argues that even if the plaintiffs did establish a prima facie case of retaliation, it articulated a legitimate, nondiscriminatory reason for their discharges—violations of the garnishment policy.

The district court found that the plaintiffs failed to show a causal connection between the filing of the charges and their terminations. The district court further found that the evidence demonstrated legitimate, nondiscriminatory reasons for the plaintiffs' terminations—violations of the garnishment policy. These findings are not clearly erroneous. It is undisputed that the plaintiffs did in fact violate the garnishment policy.[55] Because the penalty for such a violation was termination, D & L properly terminated the plaintiffs. *See Lewis,* 750 F.2d at 1279 (holding that when some evidence substantiates a claim of retaliation while other evidence demonstrates that the employer acted for inno-

cent reasons, the district court did not clearly err in rejecting the retaliation claim).

■ The plaintiffs argue their terminations are causally related to their protected activity because D & L did not discharge other employees who violated the garnishment policy if those employees or their relatives had not filed EEOC charges. The plaintiffs point to seven individuals whom they argue should have been discharged under the policy but were not. Six of the individuals named by the plaintiffs, however, did not violate the garnishment policy.[56] Moreover, the mere fact that one individual violated the policy without being fired, does not by itself amount to race-based discrimination. *See Lewis,* 750 F.2d at 1278 n. 19 (finding that irregular exceptions to a valid policy did not support a retaliation claim); *cf. Odom v. Frank,* 3 F.3d 839, 850 (5th Cir. 1993) (noting that "misfeasance, malfeasance, or nonfeasance—without nexus to . . . race— is not actionable"). Furthermore, contrary to the plaintiffs' contention, the evidence indicates that D & L discharged under the garnishment policy other black employees who had not filed EEOC claims.[57] Additionally, the plaintiffs presented no evidence suggesting that D & L did not discharge white

54. Haywood did not file EEOC charges, but his father did.

55. Jackson argues that D & L terminated her one day before the 30–day grace period for her fourth garnishment expired. Haynes, however, testified that she measured the grace period monthly— i.e., if an employee was notified of a garnishment on the fifth day of one month, the grace period expired on the sixth day of the following month. Thus, while the grace period usually was 30 days, in some instances it actually was either 29 or 31 days. Because Jackson was notified of her fourth garnishment on February 12, 1985 and fired on March 13, her termination was totally consistent with D & L's customary application of the garnishment policy.

56. The plaintiffs contend that D & L would have discharged Charles Daniels, Larry Drake, Hazel Lofton, Alice Stapleton, Larry Wesley, and Eddie Williams had the garnishment policy been applied nondiscriminatorily. However, the district court found that Daniels did not violate the policy because Haynes, in applying the policy, did not count garnishments that employees received before she became personnel manager; Drake, Lofton, and Williams did not violate the policy

because the thirty-day grace period for the fourth garnishment extended over two years beyond the date that they received their first garnishment; Williams did not violate the policy because his fourth garnishment was released before the end of the thirty-day grace period; Stapleton filed a bankruptcy petition, which barred D & L from counting the garnishments against her; and Wesley did not violate D & L's garnishment policy either because Haynes did not count garnishments received before she became personnel manager or because Haynes simply misapplied the policy. After reviewing the record, we have determined that these findings are not clearly erroneous. Moreover, Lofton was the sister of Robert Melvin, who not only filed EEOC charges but was a named plaintiff in this suit. This fact is wholly inconsistent with the plaintiffs' contention that D & L discharged under the garnishment policy only those black employees who filed EEOC charges themselves or had close relatives do so.

57. D & L discharged Lester Archie, James Humphrey, and Jimmie James for violations of the garnishment policy. Moreover, D & L discharged Humphrey on the same day that it discharged plaintiff Belinda Cox.

employees who violated the policy. Consequently, the district court did not err in finding that no causal link existed between the filing of the EEOC charges and the plaintiffs' discharges. We therefore uphold the district court's finding that D & L did not discharge the plaintiffs in retaliation for their participation in protected activity.

## IX

The plaintiffs failed to produce sufficient evidence demonstrating that D & L engaged in any race-based discrimination. Accordingly, we **AFFIRM** the judgment of the district court in all respects.

JOHNSON, Circuit Judge, dissenting in part:

The facts here clearly show that there have been scores of individuals who have endured racial discrimination at the behest of Douglas and Lomason ("D & L"). Many of these individuals have been pressured by the president of the company to drop this cause of action "for the good of the company." Instead of bowing to the company president's threats of closing the plant and laying off hundreds of people because of this lawsuit, the plaintiffs have stood up for what they believed to be their rights to equal employment. Despite a plethora of evidence which seems to overwhelmingly support the Plaintiff's contentions, the district court found that no racial discrimination occurred. The majority affirms. After carefully reviewing the record, this writer is constrained to dissent.

### A. Disparate Impact in Hiring

#### 1. The Law

The most appropriate place to begin an analysis of disparate impact claims is the law. The seminal disparate impact case, *Griggs v. Duke Power Co.,* explained that Congress' objective in enacting Title VII was to "achieve equality of employment opportunities and remove barriers that have operated in the past to favor an identifiable group of white employees over other employees." 401 U.S. 424, 429–30 (1971). The Court went on to determine that "practices, procedures, or tests neutral on their face, and even neutral in terms of intent, cannot be maintained if they operate to 'freeze' the status quo of prior discriminatory employment practices." 401 U.S. at 429–30, 91 S.Ct. 849, 853, 28 L.Ed.2d 158. According to the Court, "good intent or absence of discriminatory intent does not redeem employment procedures or testing mechanisms that operate as 'built-in headwinds' for minority groups and are unrelated to measuring job capability." *Id.* at 432, 91 S.Ct. at 854.

The Court elucidated the proof requirements for disparate impact cases in *Wards Cove Packing Co., Inc. v. Atonio,* 490 U.S. 642, 109 S.Ct. 2115, 104 L.Ed.2d 733 (1989). It ruled that for a Title VII plaintiff to successfully present a disparate impact claim, he or she must point to a particular employment practice that has created such disparate impact. *Id.* at 657, 109 S.Ct. at 2124–25. The plaintiffs in *Wards Cove* alleged that the practices in question were, *inter alia,* nepotism, the creation of separate hiring channels, the practice of preferential treatment in rehiring, and the use of subjective decision making. *Id.* The Supreme Court concluded that the plaintiffs had properly presented a disparate impact claim by pointing to such practices which, if proved, would support a finding of racial discrimination. *Id.*

#### 2. Alleged Discriminatory Employment Practices

In the instant case, the district court concluded that Plaintiffs had failed to identify which of D&L's employment practices adversely impacted African Americans. The majority asserts that the Plaintiffs did, in fact, identify an employment practice—namely, D&L's policy which requires applicants to complete applications at the plant. However, the majority asserts that such a practice could not justify resort to the disparate impact theory. Maj. op. at 1284.

The record belies the conclusions of both the majority and the district court. The pretrial order, signed by the district court, agreed to by counsel for each party, and filed just over one month prior to the trial, states plainly, "Plaintiffs allege that the defendant company has discriminated against blacks in hiring, both by restricting access to applica-

tion forms and by failing and refusing to hire those blacks who are permitted to fill out application forms on the same basis as whites who fill out application forms." R. at 2590. Restricting access to application forms and using different hiring standards for blacks, as opposed to whites, are both employment "practices" which justify the application of the disparate impact theory to the facts of this case.

### 3. Anecdotal Evidence

The majority "found" that the "record contains no evidence indicating that D&L's application procedures affected potential black applicants any differently than potential white applicants." Maj. op. at 1285–86. Reading the record reveals otherwise. The record quite readily shows that D&L's application procedures almost exclusively affected blacks. D&L's expert, Dr. Joan Haworth, testified that the hiring practices initiated by Patty Haynes—specifically the restriction of application forms—caused "wild fluctuations" in the percent of black applicants who were hired.[1] The defense "hung its hat" on this explanation. In its argument to the district court during its Rule 41 motion, D&L's attorney contended that Patty Haynes' change in the hiring procedures *alone* was enough to cause the change in the proportion of black hires from the pre-Grizzard era.

D&L's—and Plaintiffs'—contention that Ms. Haynes practice of restricting access to application forms caused the changes in black hires at the Cleveland plant is completely substantiated by the record.[2] D&L and Plaintiffs introduced into evidence dozens of depositions of black individuals who had attempted to obtain, but who were refused, applications from D&L when the company was hiring. Many of the deponents identified black friends and/or family members who were also denied the opportunity to file applications.[3] In all, Plaintiffs identified more than fifty blacks to whom D&L refused applications. The vast majority of these people attempted to obtain applications numerous times. Many of them asserted that they became discouraged and stopped trying to obtain applications. Further, there is no dispute that a great number of them sought to apply for jobs at D&L when the company was hiring. Reviewing this evidence, the majority properly claims that "the black individuals turned away at the *gate* by D&L guards never saw D&L give any applications to whites seeking employment." Maj. op. at 1285–86 (emphasis added). However, that finding probably provides little comfort to the blacks who testified that they not only saw whites obtaining applications, but also saw whites being *hired* at the same time that blacks were being turned away in the *personnel office*—as opposed to the *gate*.[4]

---

1. Prior to James Grizzard's arrival at the Cleveland plant, 64.6% of those hired for general factory jobs at D&L were black. When Mr. Grizzard became plant manager, that number dropped to 46.5%. After Mr. Grizzard left, the black hires rose to 61.1%.

2. Even the district court recognized that Patty Haynes' employment practices may have adversely affected blacks. In discussing the fact that the percentage of black hires dropped significantly during the Grizzard years, as compared with the pre-Grizzard years, the court concluded, "Finally, plaintiffs' analysis in this instance fails to take into consideration the difference in the practices and procedures initiated by Ms. Haynes which were in effect during the Grizzard years and differed substantially from what was done by her predecessor." Op. at 18–19.

3. The district court correctly recognized that these statements are hearsay in nature. However, it neglected to recognize that D&L never objected to the introduction of the depositions on that basis or on *any* basis.

4. For example, J.C. Evans, a black man, stated that he followed Bobby Jolly, a white school mate, into the personnel office. He saw Patty Haynes talking to Jolly and a group of approximately ten other white individuals. Mr. Evans could not hear what Ms. Haynes told the white applicants. However, as Jolly started to leave the area, he passed Evans and informed Evans that he, Jolly, had been hired. Patty Haynes told Evans to come back the next day. He left without an application, and when he returned the following day pursuant to Ms. Haynes' instructions, he was told that the company was not hiring.

Likewise, Ms. Lizzie White, a black woman, explained in an affidavit that she visited the personnel office at the same time that Teresa Boswell, an acquaintance who was white, visited the office. Ms. Boswell not only obtained an application, but she was also hired the same day. Ms. White was turned away without an application.

One would think—and the law certainly requires—that the restriction of applications would impact on whites equally. However, such is far from the case here. As compared to the two and one-half score blacks who were refused applications, D&L presented the resounding number of *three* whites who had been refused applications. Although dozens of blacks sought to obtain applications while the company was hiring, not one of the white potential applicants sought an application during such periods.

### 4. Statistical Evidence

#### a. The Law

The disparate impact model usually focuses on statistical analysis. *Watson v. Fort Worth Bank and Trust,* 487 U.S. 977, 987, 108 S.Ct. 2777, 2784–85, 101 L.Ed.2d 827 (1988). Statistical data is probative, however, only if it properly compares relevant elements. *See Hazelwood School District v. United States,* 433 U.S. 299, 97 S.Ct. 2736, 53 L.Ed.2d 768 (1977). The "proper comparison [is] between the racial composition of [the at-issue jobs] and the racial composition of the qualified ... population in the relevant labor market." *Wards Cove,* 490 U.S. at 651, 109 S.Ct. at 2121 (quoting *Hazelwood,* 433 U.S. at 308, 97 S.Ct. at 2741–42). However, where labor market statistics are impossible to ascertain, the Supreme Court has recognized that "certain other statistics—such as measures indicating the racial composition of 'otherwise-qualified applicants' for at-issue jobs—are equally probative for this purpose." *Id.*

#### b. The Facts

All agree that the best comparison in this case would be the racial composition of the applicant flow into D&L for general factory jobs as compared with the racial composition of the general factory hires. The district court found that such a comparison is possible. The majority found no clear error in that finding. Both are wrong.

Fewer than two years after the filing of this lawsuit, Patty Haynes testified during a deposition that she started to retain all of the applications after she learned that some employees filed EEOC charges in October of 1984. She explained that she threw away a number of applications just prior to that time, and she was not sure whether she also threw away some of the applications which were filed during the five months preceding the filing of the EEOC charges.

Statistics, which D&L did not dispute, confirm that Ms. Haynes failed to retain all of the applications. Ms. Haynes testified, and the district court found, that she, as a general rule, would accept twelve to fifteen applications per seven hires. This was a fairly constant practice, and once she adopted this practice, she did not deviate therefrom throughout her tenure as personnel manager. The application data which exists after the EEOC charges were filed (October 17, 1984) are consistent with Ms. Haynes' explanation of her practice: Of the applications on hand, almost forty percent came from unhired applicants. Hence, for every six hires, Ms. Haynes was able to consider ten applicants. The application information for the period prior to the filing of the EEOC charges presents a vastly different picture. Of the applications on hand which were filed prior to October 17, 1984, only twenty-two percent were filed by unhired applicants. Contrary to Ms. Haynes' explication of her practice of accepting twelve to fifteen applications per seven hires, and contrary to the district court's acceptance of that explanation, Ms. Haynes would have been required to hire four people out of every five applicants throughout that period.

The difference in the applications is not only substantial, but it is also statistically significant. Dr. Charles Mann, a statistician, testified—and D&L did not dispute—that all things being equal—and according to Ms. Haynes, all things *were* equal—there were only four chances in *one thousand* that all of the applications existed.[5] Dr. Mann's calculation reveals that Ms. Haynes' uncertainty

---

**5.** Notably, when she testified in a sex discrimination case prior to the trial of this case, Dr. Haworth performed a similar analysis which determined the existence of all applications for a certain period of time.

about her retention of all of the applications was well-founded.[6]

Even if all of the applications were available—and they clearly are not—reliance on the applications would be inappropriate in light of the fact that the company disproportionately restricted black potential applicants' access to the forms. Barriers and/or practices which deter qualified minorities from applying for jobs impermissibly taints any analysis which employs the use of actual applicant-flow data. *Dothard v. Rawlinson,* 433 U.S. 321, 330, 97 S.Ct. 2720, 2727, 53 L.Ed.2d 786 (1977) ("The application process might itself not adequately reflect the actual potential applicant pool, since otherwise qual-

ified people might be discouraged from applying" because of the alleged discriminatory practices); *see Wards Cove,* 490 U.S. at 653, 109 S.Ct. at 2122–23 (*"As long as there are no barriers or practices deterring qualified nonwhites from applying* ... if the percentage of selected applicants who are nonwhite is not significantly less than the percentage of qualified applicants who are nonwhite, the employer's selection mechanism probably does not operate with a disparate impact on minorities." (emphasis added)). In light of D&L's restrictions on blacks' attempts to obtain applications, the true applicant-flow information cannot form the basis of the statistical analysis in this case.[7] Hence, the

**6.** Dr. Haworth, who had no personal knowledge of the retention of the applications, was the only witness to claim that all of the applications existed. However, she spoke with great diffidence. *See, e.g.,* Trans. Vol. 22 at 1714–15 ("For that period of time [of May 4, 1984 through January, 1985] I have the applications of the nonhired people and the applications of the hired people, as far as I can tell *to the extent that they exist."* (emphasis added)); *Id.* at 1718 ("[T]hese are the pools for which I *believe* I have the nonhired applications *to the extent that they're available."* (emphasis added)).

**7.** Dr. Haworth's statistical analysis is infirm for a number of other reasons, as well. First, when cross-examined by Plaintiffs' counsel, she admitted that she excluded 11 applications which were undated. (Failing to date an application was not fatal. Patty Haynes hired several people who forgot to place the date on their application.) Nine of those applications came from blacks. Additionally, Dr. Haworth included the application of a white person who sought a general maintenance mechanic position, not a general factory position—the position at issue here. Finally, in her statistical analysis of D&L's hiring practices for 1984, Dr. Haworth excluded the October–November hiring period. She claimed that the white applicants in that period had greater blue collar and/or manufacturing experience than the black applicants. Patty Haynes, however, testified that prior plant production experience—which *none* of the white applicants possessed—not blue collar or manufacturing experience, was beneficial for applicants seeking general factory work at D&L. The district court did not adopt this rationale. It was correct in so doing.

The district court erred, however, in substituting its own rationale for the exclusion of the October–November applications. The court reasoned that because blacks began to file EEOC charges of racial discrimination in October 1984, the black community conspired to flood D&L with applications of black individuals so as to

increase the black proportion of the applicant flow. The court's reasoning has no basis in logic or in the record.

Initially and importantly, the Supreme Court has discommended courts' supply of explanations for statistical disparities when those explanations neither have support in the record nor constitute valid judicial presumptions. *See infra* note 13; *see also Castaneda v. Partida,* 430 U.S. 482, 500, 97 S.Ct. 1272, 51 L.Ed.2d 498 (1977). Speculative inferences and suppositions proffered by courts, as opposed to parties, are improper and impermissible. *Mayor of Philadelphia v. Educational Equality League,* 415 U.S. 605, 619, 621, 94 S.Ct. 1323, 1332–33, 1333–34, 39 L.Ed.2d 630 (1974).

In this case, the court's explication of its rejection of the October–November data finds absolutely no support in the record. There is no testimony, no suggestion, no intimation in the record which remotely implies that numerous blacks applied for jobs at D&L to affect applicant-flow data. There is not even a suggestion that a greater proportion of blacks than normal applied for general factory positions in October 1984. In fact, when specifically informed about the number of applications filed by blacks and whites in October 1984 and her selection rate of those applicants, Ms. Haynes testified during her 1987 deposition that she knew no reason other than race for the disparity in hiring. Mr. Grizzard similarly testified in his deposition that he knew of no reason why the hiring rates for October 1984 were so favorable toward whites. Dr. Haworth testified that the EEOC investigation of D&L did not make the October 1984 applicant-flow data unreliable. She specifically stated that those numbers should *not* be discarded because the EEOC had been brought into D&L hiring matters. Finally, Dr. Haworth testified that the applicant-flow data did not "fluctuate wildly" in 1984. The availability of blacks, according to Dr. Haworth, was constant.

The district court's explication for his rejection of the October 1984 applications—that once

district court should have resorted to appropriate proxy information, which the Supreme Court has declared to be "equally probative." *Wards Cove*, 490 U.S. at 651, 109 S.Ct. at 2121–22.

Plaintiffs proffered seven different standards of availability which served as a proxy for the actual applicant-flow information. Four of those standards were particularly persuasive: 1) the Mississippi State Employment System ("MSES") referrals to D&L for 1985, 2) the fully registered persons with MSES,[8] 3) the number of general factory hires during the four and three-quarter years preceding Mr. Grizzard's arrival, and 4) the number of people in Bolivar County who are were employed as operators, fabricators, and laborers in factories other than D&L, as shown by the 1980 census.[9]

The first standard contains all of the application forms of all interested D&L applicants during the time period in issue which were on file with MSES. This standard is untainted by unfair restrictions on blacks' ability to obtain such applications.[10] The district court rejected this standard because it was "an extremely small sample." Interestingly enough, however, the court credited Dr. Ha-

worth's statistical analysis of her "pools" of applications, and each such pool was smaller than the pool in this first standard.[11] The district court's rejection of this standard is directly antithetical to its acceptance of Dr. Haworth's pools. In this writer's view, it is clearly erroneous. Furthermore, this standard provides a reliable barometer of the general D&L applicant flow during the periods in question. Indeed, Dr. Haworth, herself, testified that this standard, though not perfect, was valid.[12] The proportion of black applicants in this standard was 65.6%. When compared with the actual number of blacks hired, the standard showed statistical significance at 8.8 standard deviations.[13]

The district court rejected the second standard, claiming that this standard is "heavily weighted" in favor of blacks because of their over-utilization of MSES. Dr. Haworth testified that a national study indicated that blacks in large urban areas generally are more likely to use public employment services than whites. She tempered her testimony with the caveat that she did not know whether this study was applicable to Bolivar County, which is small and rural. Dr. Haworth

---

blacks heard of the charges of discrimination at D&L, they flocked to apply for positions with the company—is also illogical. Among other things the district court's explanation assumes that the black applicants—people who applied for jobs which did not even require a high school education—understood that in proffering statistical proof in a disparate impact case, plaintiffs would want to have a greater minority presence in the applicant flow. According to the district court, Oliver Robinson, a man whom both parties stipulated was a paranoid schizophrenic, encouraged blacks to apply so as to skew the applicant flow. These unsupported suppositions assume way too much, and in my view constitute clear, indeed patent, error.

8. This standard excluded any individuals who were younger than 18 years old and who had any one of seven characteristics which might imply that they were not genuinely interested in employment. Individuals were excluded if they received welfare benefits or Food Stamps, if they were applying for Food Stamps, if they were in the WIN Project or the Summer Youth program, if they were migrant workers or had previously been coded as a migrant worker, or if they were receiving unemployment insurance.

9. My first and second relevant standards correspond to the Plaintiffs' and the district court's

second and third standards of availability. My third and fourth standards correlate to their sixth and seventh standards.

10. According to some black deponents, MSES would not permit them to file D&L applications. However, the MSES restrictions, though apparently only affecting blacks, are, in no way, as pervasive as D&L's restrictions.

11. MSES referred 92 applicants to D&L. However, the largest application pool which Dr. Haworth analyzed contained 80 applicants. The second largest pool contained just 57 applicants. The other pools, in descending order contained 48, 43, 42, and 18 applicants.

12. Although she had trouble including certain MSES referrals ("OJT's") in the pool, Dr. Haworth testified that she was *not* recommending that the OJT referrals be excluded from this standard.

13. The Supreme Court has reiterated numerous times that standard deviations greater than two or three suggest suspect activity. *See Castaneda v. Partida*, 430 U.S. 482, 496 n. 17, 97 S.Ct. 1272, 1281 n. 17, 51 L.Ed.2d 498 (1977); *Hazelwood*, 433 U.S. 299, 312 n. 17, 97 S.Ct. 2736, 2743–44 n. 17, 53 L.Ed.2d 768 (1977).

never claimed that the difference in the usage of public employment services between blacks and whites was statistically significant or even substantial. She did, on the other hand, testify that there might be only a trivial difference, or even no difference, in the usage of MSES by blacks and whites in Bolivar County.

Dr. Mark Bendick, Plaintiff's labor economist, testified that a study on the usage of public employment agencies in southern, rural areas—including Sunflower County, Mississippi, a rural county which is adjacent to Bolivar County—revealed that the public employment service usage in southern, rural areas is quite different from such usage in large urban areas. While the study did not compare blacks' and whites' usage of employment services in rural areas, Dr. Bendick testified that no study shows that rural blacks use unemployment services at a disproportionately higher rate than rural whites. The district court had no evidence contrary to Dr. Bendick's testimony on this subject, for the company did not even attempt to dispute the testimony. The district court's conclusion that the second standard is "heavily weighted" in favor of blacks due to their "over-utilization" of MSES is therefore highly speculative and is not supported by the record. In light of the Supreme Court's disapproval of a court's supply of explanations of statistical information which is not supported by the record,[14] this Court should not countenance the judicial activism by the district court. No sufficient reason exists in the record—or otherwise, for that matter—

for rejecting the overall MSES registrant information. This, the second standard of availability, reveals that 65% of the MSES registrants who were over eighteen and had none of the earlier-described characteristics were black—just six-tenths of one percent smaller than the proportion of blacks in the first standard. This standard demonstrates statistical significance at 8.5 standard deviations.

The district court ruled that in the third relevant standard of availability, Plaintiffs failed "to take into account the distinct *possibility* that the hiring rate prior to the period beginning October, 1982, *may* indeed have been discriminatory in favor of black applicants." Op. at 18 (emphasis added). Again, the district court improperly supplied reasons for ignoring Plaintiffs' statistical analysis which no party espoused at any time throughout the trial or during depositions. *See supra* note 13.

The court further explained that the differences in Patty Haynes' employment procedures perhaps accounted for the change in employment rates of blacks. The district court's statement of the obvious is actually a recitation of the disparate impact theory. Its attempt to explain away Plaintiffs' reliance upon standard three in fact embraces Plaintiffs' Title VII claim. There is no valid reason for disregarding this standard. Indeed, in light of the district court's back-door recognition that Ms. Haynes' practices may have caused the hiring disparities, there is every reason to consider this standard as a valid

---

14. In Title VII cases, the Supreme Court has consistently required parties, district courts, and circuit courts to base their decisions upon credible evidence or arguments which exist in the record. *See, e.g., Mayor of Philadelphia*, 415 U.S. at 619, 621, 94 S.Ct. at 1332–33, 1333–34 (noting that the circuit court's explanations constituted "supposition" and "speculative inference" which could not support a serious charge); *Albemarle Paper Co. v. Moody*, 422 U.S. 405, 438 n. 23, 95 S.Ct. 2362, 2382 n. 23, 45 L.Ed.2d 280 (1975) (asserting that a defendant's job relatedness claim "cannot be proved through vague and unsubstantiated hearsay").

In *Castaneda*, the Texas Court of Criminal Appeals proffered a theory which explained away a criminal defendant's charge of discrimination in grand jury selection practices. The Supreme Court rejected the State court's theory, deciding

that even though the theory was generally applicable, the record was inadequate to support the use of the theory. The Court concluded that "under the facts presented in this case, the ... theory is not developed fully enough to satisfy the State's burden of rebuttal." The Court chose to rely on the record. *Castaneda*, 430 U.S. at 500, 97 S.Ct. at 1283.

Consistent with these cases, then Justice Rehnquist elucidated in his concurrence in *Dothard v. Rawlinson* that the employer in that case may have had a justifiable reason for employing the alleged discriminatory hiring practice. However, Justice Rehnquist explained that once the burden shifts to the employer, the employer—not the court—must articulate that reason. *Dothard*, 433 U.S. at 340, 97 S.Ct. at 2732. In this case, the district court has downplayed Plaintiffs' case with reasons not proffered by the defense.

reference for a statistical analysis of the disparate impact claim. This third standard, which shows that 64.6% of the hires were black, is just four-tenths of one percent lower than the second standard and equates to 8.3 standard deviations. The consistency of the first three standards is amazing and, in this writer's view, lends greatly to their credibility and probative value.

The final standard, though rejected by the district court, is much more precise than standards accepted by the Supreme Court in *Dothard v. Rawlinson* and *International Brotherhood of Teamsters v. United States.* Those cases compared the make-up of defendants' employees to the minority presence in the general population. In *Dothard,* the Supreme Court reviewed Alabama's penitentiary system for sex discrimination in hiring. The Court upheld the district court's reliance upon generalized, national statistics which demonstrated that Alabama's hiring system discriminated against women. *Dothard,* 433 U.S. at 329–331, 97 S.Ct. at 2726–28. Similarly, the *Teamsters* Court compared the proportion of minority employees with the proportion of minorities in the general, area-wide population. *Teamsters,* 431 U.S. 324, 337 n. 17, 97 S.Ct. at 1855 n. 17. The Court in *Hazelwood School District v. United States* explained that the *Teamsters* Court's use of general population figures was "highly probative" because the jobs in question were low-skill jobs, which almost everyone in the population could acquire. 433 U.S. at 308 n. 13, 97 S.Ct. at 2741–42 n. 13. The *Wards Cove* Court further explicated that "where figures for the general population might . . .

accurately reflect the pool of qualified job applicants, . . . we have . . . permitted plaintiffs to rest their prima facie cases on such statistics as well." 490 U.S. at 651 n. 6, 109 S.Ct. at 2121 n. 6.

The final statistical standard in this case is much more probative than general population statistics,[15] for it hones that number down to the actual number of blacks who are not only in the general population, who are not only in the civilian labor market, but who also are qualified and have shown interest in the general factory-type work at issue in this case.[16] The district court's basis for rejecting this standard finds no support in the record. The court first spurned this standard because it claimed that a comparison between *hired* people and *unhired* people was inherently unreliable. While such a comparison certainly is not perfect, the facts of this case clearly prove that such a comparison greatly favors D&L, not the Plaintiffs, for the unemployment rate among blacks in Bolivar County at all relevant times has far exceeded the unemployment rates of whites in the county.[17] Hence, the proportion of black-unemployed job-seekers would obviously exceed the proportion of black general factory workers.

The District Court also rejected this last standard because not all D&L applicants have prior production-worker experience.[18] The court noted that many applicants have employment backgrounds in the service or manufacturing industries. While the court's observation is entirely true, it is, at the same time, completely irrelevant to the issue at

---

**15.** A comparison of the number of black hires at D&L during the Grizzard years with the general Bolivar County population of people who are 16 years and older also reveals statistically significant disparities in the hiring. The analysis reveals a difference which constitutes 4.5 standard deviations.

**16.** It is patently obvious—and even Dr. Haworth acknowledged—that because the black labor force in Bolivar County is heavily weighted in the low-skills jobs and has little presence in the "top rungs" of the employment ladder, the number of blacks eligible for production-worker jobs is much greater than the number of blacks in the Bolivar County civilian labor market. However, even comparison with just the black labor market reveals that there is just a little more than

one chance in a thousand that D&L's hiring during the Grizzard years happened by chance— 2.4 standard deviations. Dr. Haworth found that a comparison between the labor market and D&L's hiring was probative.

**17.** In 1982, 4.3% of the white work force was unemployed. The black unemployment rate approached five times that number: 20.7% of blacks in the county were unemployed. Likewise, in 1984 unemployment rates showed that 4% of the whites were unemployed while 19.9% of the blacks were unemployed.

**18.** The court disregarded any comparison with the blue collar and manufacturing work force for the similar reason that not all applicants possessed blue collar or manufacturing experience.

hand—what proportion of applicants at D&L were black, and hence what is a proper standard of availability for this case. Each applicant, regardless of his or her work experience, displayed interest in general factory work, just as those working in production-type jobs displayed such interest. While a comparison of the number of production workers with the number of applicants to service industry or manufacturing jobs would be unpersuasive—since those interested in the latter jobs might have no interest in the former job—the standard here focuses upon the interest which each person, whether worker or applicant, has shown in *general factory work*, the work at issue in this case. The district court's rationale for rejecting the final standard entirely misses the boat.

The last standard, which to me is completely valid, shows that 70.1% of the employees in general factory-type jobs in Bolivar County, excluding D&L employees, are black. Statistical significance, at 11.3 standard deviations, plainly shows that, like the other standards, the hiring results during the Grizzard years did not happen by chance.[19] Under any of these standards, it seems abundantly clear that Plaintiffs have successfully made out a *prima facie* case of race discrimination in D&L's hiring practices,[20] and the district court so found during trial.

### 5. Conclusion

D&L, in essence, conceded Plaintiffs' disparate impact[21] case in hiring by agreeing that the changes Patty Haynes made in her hiring practices—namely, her restriction of application forms—resulted in the significant change in the proportion of blacks hired. Even without such a concession, all credible evidence demonstrates that D&L's hiring during the Grizzard era was discriminatory with respect to race. This Court should therefore reverse on this issue and remand for the district court to decide damages.

19. Comparison with Bolivar County's civilian labor force (2.4 standard deviations), manufacturing labor force (5.2 standard deviations), and blue collar labor force (6.4 standard deviations) likewise demonstrates statistically significant hiring disparities. Dr. Haworth found such comparisons to be valid.

20. Basing her conclusion upon the actual number of remaining applications, Dr. Haworth contended that only 45.5% to 46.7% of the D&L applications came from blacks. The district court accepted these numbers, which should be rejected, not only because the applicant-flow data is incomplete and irrevocably tainted, as earlier discussed, but because the numbers are thoroughly illogical in light of the demographics in Bolivar County.

Although the majority of people in the civilian labor force, the manufacturing labor force, and the blue collar labor force in Bolivar County is black—51.9%, 58.2%, and 60.7% respectively—and only 3% of the professionals and managers in the county are black, the 45.5% to 46.7% range implies that the black labor force in the rural Mississippi Delta County of Bolivar is weighted more heavily at the "top rungs" of the employment ladder than at the bottom rungs. Logic, census data, and even Dr. Haworth, *see supra* n. 16, all agree that the opposite is true.

Dr. Haworth's numbers are not only "out of touch" with the demographics of Bolivar County, but they are vastly different from the applicant-flow data of factories which are in close proximity to D&L. Of the people MSES referred to Colortile for general factory jobs, 68.7% were black. Additionally, 84.4% of the applicants for general factory work in Baxter Travenol, which is located directly across the street from D&L, were black.

Dr. Haworth's data is also inconsistent with Patty Haynes' experience. For example, Haynes testified that on one occasion, she invited everyone to apply for general factory jobs at a mass application distribution. Three to four hundred people stood in the snow on that February 1983 morning to apply for a job. Haynes testified that there were many more blacks than whites; many more than 51% of the applicants were black.

All in all, any comparison between the standard of availability which Dr. Haworth generated and any valid, reliable indicator of the proportion of blacks who showed interest in the production worker jobs at D&L confirm that Dr. Haworth's numbers are wrong. Her analysis should be rejected as fallacious and contrived.

21. The majority rebuffed Plaintiffs' disparate treatment claim, finding basically no use of racial epithets. Notably, however, the record shows that epithets were, in fact, used by certain management personnel. James Grizzard testified in a deposition, which neither the district court nor the majority read, that he regularly called black employees "boy." Grizzard believed the term to be a friendly one. Patty Haynes testified that she heard blacks complain that Tom Garner, the plant production manager during the Grizzard years, called them "boy." Further, one of D&L's black supervisors testified that he had a foreman who, during the Grizzard years, told racist jokes. The district court and majority apparently ignored this testimony.

B. Promotions

1. Proper Labor Pool

Like the district court's analysis and the majority's review of the hiring data, this writer finds that the analysis and review of the promotion statistics are greatly misleading. The majority, quoting *Lewis v. National Labor Relations Board*, correctly sets forth the proper statistical framework upon which claims of promotion discrimination claims must be based: "In establishing an inference of discrimination from statistical evidence, the 'required comparison [is] to a *qualified* pool of employees *presumptively eligible* for promotion.'" Maj. op. at 1290 (quoting *Lewis*, 750 F.2d 1266, 1275 (5th Cir.1985) (emphasis in original)).

Unlike this case, in both *Lewis*, which this writer authored, and *Pouncy v. Prudential Insurance Company of America*, to which the majority refers, there were minimum objective qualifications for promotions which precluded comparison of the proportion of minorities promoted to the proportion of minorities in the overall work force. The pro-motion pool was smaller than the entire work force. In *Pouncy*, only those employed at level eleven could be promoted to level twenty. *Pouncy*, 499 F.Supp. 427, 454 (S.D.Tex. 1980), *aff'd*, 668 F.2d 795 (5th Cir.1982). Similarly, in *Lewis*, only employees who had reached the GS–12 field examiner level or the GS–13 field attorney level were "presumptively eligible" for promotion. *Lewis*, 750 F.2d at 1275. Comparison with the entire work force in those cases was improper, since not all of the employees had reached the required employment level for promotion.

This case is quite different. Here, every production worker is "presumptively eligible" for promotion to the leader positions in question, and every leader is "presumptively eligible" for promotion to the foreman positions in question. There is no educational, skill, or other objective requirement for promotion to those positions at D&L.[22] With the exception of the attendance record,[23] all of the "qualifications" which the D&L supervisors thought were important were entirely subjective.[24] An unsupported claim that blacks

---

22. In fact, James Grizzard—plant manager of the Cleveland plant from 1982 to 1986 and executive manager over two plants at the time of trial—dropped out of high school after the tenth grade and attained a GED thereafter. He did not possess any type of college degree. Indeed, he never even attended college.

23. Although attendance was a good reason for rejecting blacks for promotion, it apparently was not a sufficient reason for rejecting whites. For example, Plaintiff Richard Grant was purportedly a good worker whom James Grizzard recommended for promotion. According to Robert Goodman, a plant supervisor, Grant had a good attendance record. However, a promotion for which Grant was considered went to Jerry Swinford, a white employee. Swinford had worked at D&L for just 14.6 months at the time of his promotion. During those 14 months, Swinford reported off for sickness 11 times, reported off for personal business six times, came to work late three times, left early twice, and was AWOL once.

Another example is James Bowen, who was hired as a foreman after meeting Mr. Grizzard in the all-white VFW Club. During his first eighteen months on the job, Bowen left early or left and returned 19 times and came to work late eight times.

24. D&L supervisors testified that plant experience and seniority were important considerations for promotion. James Grizzard testified in a deposition that plant experience was a big consideration. Even so, nine people with fewer than five months' experience were promoted to leader during the Grizzard years. Four of the nine had worked at the plant fewer than two months. All nine were white.

Howard Watson and E.W. Tolbert, both supervisors, testified that prior to James Grizzard's arrival, they had never seen such inexperienced people promoted. Wallace Bailey, the assistant supervisor over the maintenance department, testified that he did not know anyone in the pre-Grizzard period who was promoted without having "some years'" experience as a production worker.

The lack of experience of the leaders and foremen in the plant hurt the productivity of the plant. Soon after James Grizzard arrived, Harry Lomason, president of D&L, wrote Mr. Grizzard to inform him that the quality and manufacturing systems were out of control. In August of 1983, Ford Motor Company informed D&L that it had serious concerns about the quality of work coming from the Cleveland plant. One of the D&L vice presidents wrote D&L plant managers in February 1985 to give them guidance on fixing the on-going quality problems. One of the causes of the plants' problems was "insufficient training or personnel (production and supervision)." Mr. Grizzard testified in his deposition that he did nothing different after receiving this letter. Eight months later, Harry Lomason wrote Mr. Grizzard and three other individuals

possess these subjective characteristics at a substantially lower proportion than whites is, in itself, a discriminatory claim in which the district court apparently finds solace.

D&L's entire work force, which was approximately 70% black, is the proper pool to which the promotions should be compared,[25] for that is the pool from which promotions came.[26] At no time have promotions approximated 70%. Interestingly enough, however, prior to Mr. Grizzard's arrival at D&L, 63.8% of the promotions went to blacks. That number plummeted to 22.7%[27] during his tenure as plant manager and returned to 63.7% after Plaintiffs filed this lawsuit. When asked why the number of black promotions had declined so drastically, neither Mr. Grizzard nor any supervisor so questioned could offer an explanation.

Contrary to the majority's reliance on the fact that a number of blacks had turned down promotions, Byron Kyle, supervisor over one half of the plant, Howard Watson, production manager for the Cleveland plant, and Charlie Lofton, supervisor over the press area in the plant, all testified that prior to Mr. Grizzard's arrival, blacks and whites turned down promotions. They asserted that the number of people who turned down such promotions did not change during Mr. Grizzard's tenure or after his departure. In fact, a substantial number of blacks who turned down promotions during the Grizzard years had also turned down promotions during the pre-Grizzard years. These employees were repeatedly offered promotions.[28] Based upon such testimony, blacks' rejection of promotions could not be the reason for the stark decline in black promotions. Indeed, no supervisor ever even intimated that such was the case.

### 2. Comparison With Supervisors in Bolivar County

Dr. Haworth and the district court agree that a comparison of the promotions at D&L with the percentage of blacks in supervisory positions in Bolivar County is more relevant than a comparison of the promotions to the

that D&L's standing and reputation with Ford was "at an all-time low." Mr. Grizzard affirmed that Mr. Lomason's statement was directly applicable to the Cleveland plant. 'Tis notable, indeed, that soon after this letter was written, the supervisors at the Cleveland plant began to promote more experienced workers.

Finally, this writer notes that in computing the number of months' experience of those promoted during the Grizzard years, the majority apparently included the demotion of Larry Vardaman, who had been at the plant for 194.8 months before he was *demoted* from the position of foreman. Vardaman had twice been promoted to foreman prior to Grizzard's arrival. The majority's inclusion of Vardaman in its calculation is erroneous. Absent Vardaman's demotion, the evidence shows that the whites who were promoted during Mr. Grizzard's tenure, indeed possessed an average of approximately 15 months' experience at the time of their promotion.

**25.** The proportion of blacks at the production-worker level exceeds the proportion of blacks hired in that position. Dr. Haworth and Dr. Bendick explained that a much greater number of whites voluntarily quit their employment with D&L than blacks. Ms. Haynes confirmed this, testifying that many whites quit soon after they are hired. On average, blacks are employed at D&L twice as long as whites. Over time, the longevity difference has resulted in a much higher percentage of blacks in the company than whites.

**26.** The district court stated that such a comparison disregarded the company's practice of hiring individuals from outside the plant. However, the district court disregarded Mr. Grizzard's deposition testimony that D&L's practice was to promote from *within* the company.

**27.** The district court included salaried supervisors in its review of Plaintiffs' promotion claims. Such inclusion of supervisors is clearly erroneous. Plaintiffs have never claimed that D&L discriminated on the basis of race in promoting supervisors.

**28.** Hence, rejection of a promotion clearly did not disqualify an employee from future promotions. In fact, Howard Watson, production manager of the entire plant, testified that after he was first promoted to leader, he requested that he be returned to the production-worker level because he did not think that he could handle the job. He was later promoted again. Possessing one of the highest jobs in the Cleveland plant, Mr. Watson, himself, demonstrated that his rejection of a promotion was not fatal to his promotion opportunities. It should not have been fatal for Earnest Hall's or Richard Grant's promotion opportunities either. Indeed, Mr. Grizzard asserted in his deposition that after Richard Grant turned down the promotion to which the district court refers, Grant informed Grizzard that he, Grant, was again interested in being promoted.

applicable labor pool. Such a comparison is highly questionable.

According to Dr. Haworth, most of the supervisory positions to which she compared D&L's promotions were precision craft positions. The "bulk" of those positions were held by craftsmen and craftswomen. Dr. Haworth testified that blacks held only 33.4% of the precision craft jobs in Bolivar County. On the contrary, 70.1% of the general factory jobs belonged to blacks. To therefore compare the leader and foreman positions to precision craft, as opposed to the general factory pool from which the promotions in question came is like comparing apples to watermelons. The comparison is simply irrelevant.[29]

### 3. Conclusion

A proper analysis of this issue reveals that D&L improperly considered race in its promotion practices. D&L did not provide a race neutral reason why, when 70% of the promotion pool is made up of presumptively qualified blacks, only 22.7% of the leader/foreman promotions went to blacks during Mr. Grizzard's tenure—a number which had dropped from 64.8%. It appears that the company tried to make the promotion disparity disappear. Because there is no legitimate explanation for the decrease in minority promotions, Plaintiffs must prevail. This Court should reverse and remand for a trial on the damage issue here.

### C. Temporary Upgrades to Rack/General Maintenance [30]

### 1. Qualified Employees

The majority's review of the temporary upgrade evidence is also questionable. The

majority's contention that welding experience was needed for both general maintenance and rack maintenance positions is completely refuted by Wallace Bailey, the assistant supervisor over the maintenance department. Bailey testified at trial that one who sought a temporary upgrade needed to have a mechanical background, have a familiarity with electrical equipment, have the ability to understand written and verbal instructions, and *for rack*, as opposed to *general*, maintenance positions, possess welding experience. Bailey averred that one would not be disqualified if he did not possess all of these qualities. In fact, he asserted that he would not even exclude a person simply because that person could not weld. Nevertheless, the majority contends that no blacks were qualified for the general maintenance or rack maintenance positions. The evidence appears to be to the contrary. ·

*Tommy Hardy:* Contrary to the majority's recitation of the facts, Tommy Hardy did not have "limited" welding experience. To the contrary, Hardy testified that he ran a body shop in which he welded auto parts. He started the body shop in 1975 or 1976, and it was still in operation at the time of trial. Hardy's welding experience was therefore very extensive. Hardy averred that the type of welding done at D&L was the same type of welding which he performed in his body shop. His work in his body shop also revealed that he had mechanical ability. Hardy testified that he informed Lamar Hays and Terry Lamb, supervisors in the maintenance shop, of his interest in temporary upgrades numerous times.

*Daniel Anderson:* Anderson testified that he had limited welding experience. Howev-

---

**29.** The district court's finding that blacks were treated favorably during the pre-Grizzard years is likewise unfounded. The promotions in the pre-Grizzard years roughly reflects the pool of presumptively eligible employees.

**30.** Both the district court and majority included all craft positions in their analysis, as opposed to the general and rack maintenance positions which are at issue here. They also analyzed promotions for all craft positions, instead of the maintenance positions in question. When James Grizzard came to the Cleveland plant, 66.7% of these maintenance positions were held by blacks.

That number decreased during his tenure to 54.1% black. Also, there were only three promotions in the maintenance positions during the Grizzard years. The proper comparison is therefore the 33.3% promotions which went to blacks as compared with the 54.1% of the blacks who were presumptively eligible for promotion. Although the majority's analysis is flawed, this writer agrees that Plaintiffs did not prove whether the promotion disparity in the maintenance positions was statistically significant or that race discrimination played a part in the promotion decisions for rack and general maintenance.

er, he asserted that he had substantial mechanical ability. He had taken mechanics classes throughout his four years in high school and had weekly repaired his or other employees' machines when D&L's maintenance personnel were unavailable. Wallace Bailey testified that he would be interested in a production worker who could take apart machines, as Anderson could.

*Alfred Kemp, Sr.:* Wallace Bailey testified during trial that Alfred Kemp, Sr., had an excellent background in maintenance. In fact, prior to James Grizzard's arrival at the plant, Kemp received both rack and general maintenance upgrades. The district court found that Howard Watson blocked every temporary upgrade which Kemp could have received during the years in question. That finding is unsupported by the record. While Watson testified that he would prohibit Kemp from receiving temporary upgrades if Kemp were needed for his general factory work, Watson conceded that he did not know whether he had blocked any such upgrades during the years in question. Wallace Bailey asserted that he knew of no reason why Kemp was not given a single upgrade from August 1982 to August 1985.

*Arthur Perry:* According to Wallace Bailey, Arthur Perry was qualified for general maintenance work. However, Bailey could not state a reason why Perry had not been given upgrades prior to the filing of this lawsuit.

### 2. Statistical Analysis

Absent some other explanation—which the company did not give—D&L's temporary upgrades reveal grave racial disparities. The majority correctly sets forth the temporary upgrade information in footnote 36. Were the temporary upgrade hours insubstantial, the percentages set forth by the majority in that footnote might not seem consequential. However, the number of hours involved in both the general and rack maintenance upgrades is considerable. During the Grizzard years, white employees were given 1199.4 hours of upgrades in general maintenance. Blacks received just ninety-seven.

In the rack maintenance area, Edward Otto Wolfe, a white employee, received 745 hours of upgrades during the Grizzard presuit period. No blacks were awarded such an upgrade during this period. The majority places some import—import which appears to be unsupported by the record—on the fact that Mr. Wolfe was the only person who received rack maintenance upgrades during the Grizzard era. James Grizzard testified in deposition that the maintenance department should *not* have solely awarded the upgrades to Mr. Wolfe. Likewise, Wallace Bailey asserted that he did not know why Mr. Wolfe was awarded all of the rack maintenance upgrades. The majority's supply of a reason, albeit an irrelevant and unfounded reason, would appear to be improper. *See supra* note 13.

### 3. Conclusion

Why whites received 1199.4 hours of general maintenance upgrades and 745 hours of rack maintenance upgrades when blacks received just ninety-seven hours of general maintenance and no hours of rack maintenance upgrades will likely never be known by this or any other court. In one of his depositions, Mr. Grizzard unequivocally refused to explicate why the company failed to provide everyone the opportunity to compete for temporary upgrades. He refused to provide an explanation even when instructed to give one by D&L's attorney.

The numbers—and the named Plaintiffs' protests—speak loudly enough for themselves in the temporary upgrade claim. Only silence comes from D&L. Therefore, this Court should reverse and remand for trial on damages.

### D. Conclusion

For the reasons heretofore stated, this writer would reverse and remand.

I dissent.